# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## CORDER v. TALBOTT.

### Decided November 30, 1878.

1. If in a common law suit the court rejects improperly evidence offered by the defendants, and the jury find a verdict for the plaintiff, such verdict should be set aside on a motion by the defendant for a new trial, even though the court may believe, that the verdict of the jury ought not and would not have been different, had the rejected evidence been considered by the jury; but a different rule prevails in the trial of issues out of chancery.

2. The declarations of a party in his own favor ought not to be received as evidence, though it be a part of the *res gestæ* of a collateral fact introduced in the case merely to contradict a witness on the other side, but which fact is in no way otherwise connected with the material enquiry involved in the case.

3. When the declarations are *merely* a narrative of a past occurrence, though made ever so soon after the occurrence, they ought not to be received in evidence, they being in such case no part of the *res gestæ*.

4. Where the declarations do not explain, illustrate or characterize a fact, but are offered merely to establish the existence of the fact, or to strengthen other proof of the existence of the fact they are not admissible in evidence as part of the *res gestæ*.

*Supersedeas* to a judgment of the circuit court of Barbour county, rendered on the 19th day of November, 1875, in an action of debt, in said court then pending, wherein James W. Corder was plaintiff, and Elam D. Talbott was defendant, granted on petition of said Talbott.

Hon. John Brannon, judge of the sixth judicial circuit, rendered the judgment complained of.

GREEN, PRESIDENT, furnishes the following statement of the case :

On March 4, 1871, James W. Corder sued out of the clerk's office of the circuit court of Barbour county a summons against Elam D. Talbott to answer a plea of debt for $1,000.00, which writ was returnable to March rules, 1871. The declaration was then filed, which was in the usual form of a declaration on a bond for $1,000.00, executed by one J. P. Thompson and the defendant Elam D. Talbott, dated October 3, 1868, and payable one day after its date. The bond was a joint and several bond ; and the declaration alleged, that John P. Thompson had confessed judgment on it on Jany. 30, 1871, but had never paid any part thereof.

At the first term of the court the defendant pleaded payment ; and issue was joined. This was a mere formal plea, to set aside the office judgment. The real defense made by the defendant to this suit was, that he had never executed the bond sued on. The plea of *non est factum* was filed October 17, 1872, to which the plaintiff replied generally ; and issue was joined thereon.

The first jury, who tried this issue, were unable to agree, and were discharged by the court. The next jury sworn to try this issue found a verdict for the plaintiff for the whole debt and interest, as claimed in the declaration.

A motion for a new trial was made and overruled ; and a bill of exceptions taken to the action of the court, which on November 20, 1875, rendered a judgment for the plaintiff in accordance with the verdict of the jury.

During the trial of the cause the defendant took a bill of exceptions which was as follows :

"*Be it remembered,* That upon the trial of this action, after the defendant, Talbott, had testified that he had not

signed his name to the writing obligatory in the declaration mentioned, and what purported to be his signature was not his signature, he stated that John P. Thompson had called on him and asked him to go his security to the plaintiff for $1,000.00, and that he refused to do so; that he, the defendant Talbott, then resided about a mile from Phillippi, on the Webster road; that he was in his yard, and he did not recollect, whether Thompson got off his horse or not, or remained at the fence and gate; and stated in reply to a question that his family consisted of his wife and small children, and a girl who lived with them at the time said Thompson so called on him, named Emma Poling; and then the said Emma Poling was introduced as a witness, who proved that some time in the fall of the year 1868, John P. Thompson came to the house of the defendant, Talbott, where he lived on said Webster road, and said Thompson and and Talbott had a conversation at the fence and gate, about thirty yards from said Talbott's house; that witness did not hear any part of said conversation, except that she heard said Talbott say to said Thompson "*I can't;*" that said Thompson separated from said Talbott and started off; that said Talbott immediately returned to his home from said fence or gate, and said Thompson got out of his hearing; and the counsel for Talbott proposed further to prove by the witness that upon his entering the porch of the house, Mrs. Talbott, the wife of defendant, asked him what said Thompson wanted, and that defendant, Talbott, replied that said Thompson wanted him to go upon a note with him, Thompson, to the plaintiff, Corder, for $1,000.00, and that he, defendant, had refused to do so; and the plaintiff's counsel objected, and the court refused to allow the counsel of defendant, Talbott, to prove by the said witness the reply of the said Talbott to his wife, to the effect proposed by him, to which ruling of the court the defendant, Talbott, by his counsel, excepts, and the exception is here signed and sealed and ordered to be made a part of the record."

The bill of exceptions to the action of the court in overruling the motion for a new trial sets forth the evidence given at the trial. The plaintiff produced the bond sued upon and proved by himself, that Thompson before the execution of this bond came to his house and proposed to borrow $1,000.00. That on the 3d of October, 1868, he told him he would lend him the money, if Talbott, the defendant, would go his security. That he knew Talbott was at home that day, as he had seen him in passing by his house. That on being told he could have the money, if Talbott would go his security, Thompson rode off in the direction of Talbott's house, and after he had been absent about long enough to go to and return from Talbott's house, he returned with the bond sued on and got the $1,000.00.

He testified further, that he had loaned Thompson before that small sums of money not exceeding $200.00 or $300.00 without security; that Talbott before that had gone security for two sums of $500.00 each, which he lent him, one of which had been paid in whole and the other partially, when this $1,000.00 was loaned him; that when Thompson confessed the judgment for the $1,000.00, he had fully paid off the remaining portion of the $500.00 loaned him, but he had not informed Talbott of it. It had been paid off in February, 1869; and after that he had no debt against Thompson except this $1,000.00; that Thompson in Corder's presence told Talbott, he had confessed this judgment, and asked, if he could not let it rest awhile, Talbott said his child was sick or dying, and he could not talk to them; that before that, when Corder first mentioned the confessing of this judgment to Talbott, and asked him what he should do, if he should issue execution on it, he replied, he should proceed according to law; that prior to January, 1871, he had urged him to draw all the money from Thompson he could, as times were squally, or becoming so; that on one occasion, when some money was paid to him, Corder, for Thompson, Talbott asked, if it was on any debt, on

which he Talbott was liable, and was told a part of it was. He said also, he was well acquainted with Talbott's signature, and had seen him write ; and he believed his signature to the $1,000.00 bond was genuine.

Thompson testified to same statement of facts relative to the loaning of the $1,000.00 ; that after he agreed to loan it in Phillippi, he, Thompson, got on his horse and rode out to Talbott's house, about a mile from Phillippi, and when he got there, Talbott was in his office up-stairs ; and he went into his office and asked him to sign this $1,000.00 bond. He said he did not like to do so ; that he was already security for him enough. But Thompson told him, that one of the $500.00 bonds he had signed was paid off, and a part of the other, that he was going to Baltimore, and when he returned, he would pay off the balance of the other $500.00 bond ; and then Talbott signed the $1,000.00 bond in his presence with a quill pen. That he was in the habit of going his security, and after this $1,000.00 bond was executed, he went his security to others in two sums of $500.00 each.

Another witness for the plaintiff testified, that in August or September, 1870, he asked Talbott, if he knew Corder had Thompson's note for $1,000.00 with him as security, which was unpaid, and that Thompson was much embarrassed and asked him, if he had any security for it. He said he had no recollection of being on any $1,000.00 note, but that he was on two notes one of $500.00 and another of $400.00. He said he would go and see Corder about this $1,000.00 note and satisfy himself about it. About a month after, he said, he had seen him. The witness's recollection is, that he said he had seen him, Corder, and it was all right, and the witness need not give himself any further trouble about it. Just before this suit was brought he, Talbott, examined this note, which was in witness's hands for collection as a lawyer, and said he had never signed it. He knew Talbott's handwriting well, and believed this was his signature to the bond.

36

A brother-in-law of both Talbott and Thompson also testified, that he was acquainted with Talbott's signature; and if this bond had been presented to him, he would not have hesitated to take it as Talbott's bond.

The defendant Talbott testified, that when Thompson rode out to see him to get him to go on this $1,000.00 bond, Thompson either remained on his horse, or got off and came in the yard, he did not recollect which. He wanted him to go his security to Corder for $1,000.00. He told him he was already security enough for him and would not go his security, and declined to go his security for the $1,000.00 to Corder; and Thompson rode off. That a girl, named Poling, lived with his family; and he did not know whether they heard this conversation. She testified, that she recollected Thompson riding up to the fence at the yard gate, which other evidence shows was about thirty yards from the house; and that he and Talbott had some conversation, which she did not hear, except she did hear Talbott say to Thompson "I can't;" and that Thompson turned his horse and rode off towards Phillippi.

The clerk of the court testified, that he knew the handwriting of Talbott well; and he would say the signature to the bond was not his; but he could not on his oath say he did not sign it. Another witness stated, he had till 1858 and 1859 had an opportunity to become acquainted with Talbott's signature, and had seen him write it; and he was of the conviction the signature of the bond was not his. Another witness, and also the plaintiff's brother, said it was not like his usual signature; but he could not say it was not his. Another witness, who had known his handwriting well, said it was his impression, it was not his signature; but he could not say on oath he did not write it. Another witness said, he could not say, whether it was his signature; that he knew his handwriting well and had never seen any of it as heavy. Another said it resembled his handwriting; but the D and T in it seemed somewhat different from

his ordinary signature. Another, who was acquainted with his handwriting, said it had not the general appearance of his usual signature.

The defendant also testified, that Thompson did not go into the house at all on the occasion of his riding out there to get him to sign this bond ; and he never signed this bond. He further said that he thought the lawyer, whose testimony has been stated, showed him this note, before he saw Corder about it, and that it was in 1871, and that it was not in McClaskey's store, as he thought, but in the alley near it; that in his first conversation he thought he had reference to the $500.00 note; that in the first conversation he had with Corder he told him : "there was something rotten in Denmark ;" that in his first conversation, spoken of by Corder, he thought it was the $500.00 note, on which Thompson had confessed judgment, as Corder had told him not long before, that one of them was not paid. He admits, that he did after the date of this $1,000.00 bond go Thompson's security in two sums of $500.00; that for one of them he did so at the instance of a person, who said if he would go security for $500.00 for him, he would go his security for a like sum, and thus help him, and he might get through. The other was for $500.00 borrowed out of bank, but as he thought, or intended, it was as second endorser and after another person.

From the judgment of the circuit court Talbott has obtained a writ of error and *supersedeas*.

*T. P. R. Brown* and *T. A. Bradford*, for plaintiff in error, relied on the following authorities :

17 Ala. 109 ; 35 Cal. 49 ; 11 Ga. 615 ; 5 Md. 450 ; 3 Ga. 513 ; 36 Miss. 190 ; 36 Ga. 380 ; Stark. Ev. (9th Am. ed.) 89 ; 2 Gratt. 594 ; 19 Gratt. 1.

*Robert White*, for defendant in error, cited the following authorities :

25 Gratt. 924 ; 3 Conn. 250 ; 1 Greenl. Ev. §§108, 110 ;

13 Johns. 350 ; 8 Barb. 530 ; 19 N. Y. 299 ; 8 N. H. 40 ; 9 Cush. 36 ; 22 Gratt. 178 ; 7 W. Va. 350 ; 24 Gratt. 536 ; 18 Gratt. 53 ; 11 Gratt 87 ; 3 Gratt. 127 ; 10 W. Va. 115 ; 8 Gratt. 289 ; 11 W. Va. 94 ; 19 Gratt. 354 ; 7 W. Va. 665 ; 12 W. Va. 116 ; 10 W. Va. 115.

GREEN, PRESIDENT, delivered the opinion of the Court :

The first question raised by this record is : Did the circuit court err in excluding from the jury the proposed evidence of Emma Poling, as set out in the bill of exceptions? It is true, as said by the appellee's counsel, that the excluded evidence could have probably had very little weight with the jury, and that taken in connection with Talbott's, those portions of Emma Poling's statements, that were permitted to go to the jury, really must have had as much, or nearly as much, weight with the jury as the entire statement of Emma Poling would have had, if it had all been allowed to go to the jury ; and that therefore the defendant was not probably materially injured by its exclusion, even had it been proper testimony ; and that the testimony certified by the court as all that was submitted, if this excluded testimony be included and considered, shows that the verdict was such as could not be set aside ; and therefore it is contended this Court ought not to reverse the judgment, even if the court did err in excluding this evidence.

This position of counsel cannot be sustained. It is true, <span>Syllabus 1.</span> as shown by the decisions in Virginia and in this State, that the Court will not reverse a judgment, merely because the court misinstructed the jury, when all the facts proven in the case are in the record, and it appears thereby that the appellant could not have been injured by the misinstruction. See *Insurance Company* v. *Hendren*, 24 Gratt. 536 ; *Colvin* v. *Menefee*, 11 Gratt. 87 ; *Pitman* v. *Breckenridge*, 3 Gratt. 127 ; *Clay* v. *Robinson*, 7 W. Va. 350. It is also true, that in the trial of an issue out of chancery, though the court refuse to permit

evidence to go to the jury that ought to have been permitted to so go, still if the court on all the evidence is satisfied that the verdict ought not to have been different, had the rejected evidence been admitted, it will not grant a new trial, merely because of such improper rejection of such evidence. *Powell et ux* v. *Manson*, 22 Gratt. 192 ; *Tompkins's ex'r* v. *Stephens et al.*, 10 W. Va. 156.

But these decisions are expressly based on a diversity in the rule in such a case between the trial of a common law and chancery issue, as explained by Lord Eldon in *Barker* v. *Ray*, 2 Russ. 63. He there says, speaking of the chancery court : "This court in granting or refusing new trials proceeds upon very different principles from those of a court of law, and that it has been ruled over and over again, if on an issue a judge refuse evidence, which ought to have been received, or receive evidence, which ought to have been rejected, although in that case a court of law would grant a new trial, yet if this court is satisfied the verdict ought not to have been different, it will not grant a new trial merely on these grounds."

We must therefore decide, whether the court erred in rejecting the portion of the evidence of Emma Poling, which it did reject. If we confine ourselves in the consideration of this question to what is set forth in the bill of exceptions to the rejecting of this evidence, we would come to the conclusion, that the whole of the evidence of Talbott and of Emma Poling ought to have been rejected by the court, including of course that part of her evidence which was rejected.

Their evidence was, so far as the exception shows, offered to prove, that some time in the fall of 1868 Thompson called upon Talbott to go his security on this proposed bond. The issue being tried was, whether Talbott had signed this bond for $1,000.00 dated October 3, 1868. This exception under consideration does not show, what proof the plaintiff offered to prove the issue on his part. It may, so far as this exception shows, have been simply

the proof of the handwriting of the defendant Talbott. On such an issue sustained by such evidence it would seem to be self-evident, that the declarations of the defendant Talbott made to third persons, either before or after the date of the bond, that he had refused on Thompson's application to sign the bond, would be improper evidence to go to the jury. It would not only have been irrelevant, but would be clearly liable to be excluded as *res inter alios acta*. And it seems obvious, that the fact, that this declaration by Talbott of his refusal to sign the bond, would be equally improper, when the declaration was shown to have been made to his co-defendant, Thompson, as when made to any other third party. The plaintiff could no more be properly affected by such declaration in the one case than in the other. In either case it was, so far as the plaintiff was concerned, *res inter alios acta*. If then we confine ourselves to what is set forth in this exception, the rejection of a portion of the evidence of Emma Poling was not only right, but if the plaintiff had asked the court to reject all the evidence of Talbott and all the evidence of Emma Poling, as stated in that exception, the court ought to have rejected the whole of it, as irrelevant and improper evidence.

As a general rule, the facts stated in one bill of exceptions cannot be noticed by an Appellate Court in considering another, when the first bill of exceptions does not refer to the second. But to this general rule there is this exception: when a bill of exceptions is taken, after all the evidence has been submitted to the jury, and it purports to set out all the evidence, the evidence set out in this bill of exceptions may be looked to in considering the question raised in another bill of exceptions taken in the progress of the trial. See *Hall* v. *Hall*, 12 W. Va. 1·

The case under consideration comes under this exception ; and we have a right in acting on this first bill of exceptions to look to the bill of exceptions to the refusal of the court to grant a new trial, in which all the evi-

dence in the cause is certified. When we look to this, we find, that the plaintiff to sustain the issue on his part proved by Thompson, that the plaintiff having required of him at Phillippi, on October 3, 1868, the day the bond was given, security upon the bond, he got on his horse and went out to the defendant Talbott's house, about a mile from Phillippi, and when he got there the defendant, Talbott, was in his office upstairs, and he went up to his office and found him there and asked him to sign this bond. He was at first unwilling to do it; but after Thompson had made an explanation to him, he signed the bond in Thompson's presence.

While the evidence of the defendant, Talbott, and witness, Emma Poling, was, as we have seen, not proper testimony directly upon the issue of *non est factum* being tried by the jury, it was to the extent the court permitted it to go to the jury, evidence to impeach the credibility of the plaintiff's most important witness, Thompson, and to contradict his statement made to the jury. It was for that purpose proper to permit the defendant, Talbott, to say, that in the interview he had with Thompson that day, he refused to sign this bond, and he then rode away without obtaining his signature, as Thompson had testified, that in the only interview he had with him that day, he was at first unwilling to sign it but afterwards consented and did actually sign it.

The question for our determination is: Ought the court to have permitted the witness, Emma Poling, to have testified, that while she did not hear Talbott refuse to sign this bond, but only heard him say "I can't" without knowing what he was talking about, or what he meant, that immediately after Thompson rode away, when Talbott reached the porch of the house, thirty yards from where this conversation took place, Mrs. Talbott asked him what Thompson wanted? and Talbott replied, "that he wanted him to go on a note with him to the plaintiff, Corder, for $1,000.00, and that he had refused to do so."

It has been laid down by some text writers of high

1878
Special Term.

Corder
v.
Talbott.

authority, that to make the declarations of a party evidence in his favor, they must be connected with the material fact of enquiry under investigation. This rule is illustrated in the case of *Tompkies et al.* v. *Reynolds*, 17 Ala. 109, where the court approves this rule and lays down the law thus : "To make the declarations of a party evidence in his favor as a part of the *res gestæ,* they must be connected with the material fact or enquiry involved in the issue."

In that case James A. Hagan obtained from the plaintiff his two notes amounting to $1,750.00 on third parties ; and he executed a receipt therefor, which he signed James A. Hagan & Co., and in which it was stated : "we are to collect these notes or return them to Reynolds, with interest from the time they were due." Tompkies and Hardy were members of the firm of James A. Hagan & Co. The plaintiff contended, that the understanding was, he lent these notes to the firm, Hagan, one of the partners, acting for them, with the understanding that if they could collect them they were to have the use of the money as so much borrowed money, if they could not collect them, the notes were to be returned. The plaintiff proved by a witness, Leeper, that he had the possession of these notes for collection, that he had collected $1,400.00 on them, and by Hagan's direction applied $700.00 to the payment of debts of James A. Hagan & Co. The defendants Hardy and Tompkies then asked the witness from whom he got these notes; he replied, from Hardy. They then offered to prove by the same witness, that at the time Hardy handed him the notes for collection, he said : "he was acting at the request of Hagan and as his agent." But the court would not permit this evidence to go to the jury ; the contention of the defendants being that this whole transaction was a private transaction of Hagan, and that the firm was not bound by the receipt given in their name by Hagan. In the opinion of the court, delivered by Dargon, C. J., on page 118 he says :

"The declarations of Hardy were intended to show, that the firm did not consider it a loan of money, but as an undertaking on the part of Hagan to collect the money for the plaintiff. The general rule is, that the declarations or admissions of a party in possession are admissible as a part of the *res gestœ* to show the character of the possession. But to make such declarations evidence, they must be connected with the principal fact. under investigation. If the fact, with which they are connected, is not the material enquiry, or if the party is not sought to be charged because of the existence of the fact, with which they are connected, they cannot be admitted as evidence. On this subject the best writers say, that to make the declaration of a party evidence in his favor, they must be connected with the material fact or enquiry under investigation. 1 Greenl. Ev. §109, 158; 1 Phillip's Ev. 231. By this rule, we think, the declarations of Hardy were properly excluded.

"The material fact was not, whether he had actually had the possession of the notes, or whether he handed them to the witness, but whether the contract was binding on the firm. The plaintiff did not seek to show the contract was binding on the firm because Hardy had had possession of the notes, or because he handed them to the witness for collection, but this proof was introduced by the defendant, Hardy, himself, and to permit him to introduce his own declarations in connection with a fact not relied upon by the plaintiff to fix his liability, nor connected with the material fact involved, would be to enable the defendant to make his own declarations evidence in his favor, where the fact, with which they are connected, is not brought out by the plaintiff, nor the ground on which he is sought to be charged."

If there be any defect in this reasoning, and I am not prepared to say that there is, it can only be in the Judge assuming that the fact, in connection with which the declarations of the defendant were offered as evidence, was

a fact not connected with the material fact at issue in the case.

In the case before us we have seen there is no difficulty in saying that the fact, in connection with which the defendant's declarations were proposed to be admitted, was in no manner connected with the material fact at issue in the case, that is, whether the defendant had signed the bond. The defendant's declaration, that he would not sign it, is in no manner connected with the material fact at issue. It is a circumstance, as we have seen, in itself so unconnected, that it would not have been given in evidence as direct evidence on the trial of this issue; and it was only admissible as a collateral fact to contradict one of the plaintiff's witnesses. And therefore they being declarations of a party in his own favor, though a part of the *res gestæ*, of a collateral fact introduced into the case merely to contradict a witness of the other side, but no way otherwise connected with the material fact or enquiry involved in the issue, were not admissible.

There are other grounds on which the declarations of the defendant to his wife made in the presence of the witness Poling in this case ought not to have been admitted. If the question at issue had been : Did the defendant in his conversation with Thompson in front of the house refuse to sign the bond? The declarations of the defendant made very shortly after Thompson left that he had so refused, would not have been a part of the *res gestæ* and as such admissible. When the declarations are merely a narrative of a past occurrence, though made ever so soon after the occurrence, they cannot be received as proof of the existence of such occurrence. Such declarations constitute no part of the *res gestæ*. As illustrations : the demand of the payment of such a check cannot be proven by a witness proving that he saw the holder of it go into the bank, and upon his coming out he declared, that he had demanded payment of the check. See *Brown* v. *Lusk*, 4 Yerg. 210. So on an indictment for keeping a house of ill fame. A witness proved he

watched the house one night. He saw some men come out of the house, and immediately on their coming out one of them spoke in conversation with the other of his having intercourse with one of the inmates of the house. The court held that such conversation was no part of the *res gestæ*, and ought not to have been received in evidence. See *Commonwealth* v. *Harwood*, 4 Gray 41. I apprehend the case would not have been altered, if the witness had further said, he heard this person speak in the house to an inmate in the house, but that what he said was unintelligible.

The case before us seems to me to fall within this principle, nor is it removed from its operation by the fact, that the witness, Poling, heard in this conversation between the parties the words " I can't "—words in themselves utterly unintelligible. These cases are readily distinguishable from the ordinary case of a prisoner declaring immediately after the killing of a man how he committed the act. In such case a material part of the enquiry is, what were the prisoner's motives or feelings, and his declarations immediately afterwards tend to show these feelings; and for this reason they are admitted. They are in such case not a mere recital of a past occurrence. The act here was the refusal by the defendant to sign this bond. Such an act in its very nature cannot be illustrated, explained or characterized by any declarations of the defendant. It in this respect seems to me like the act in *Nutting et al.* v. *Page*, 4 Gray 584. The question being tried was, whether a new dam had been raised higher than an old dam, which had been destroyed, so as to overflow more of plaintiff's land. The plaintiff endeavored to show, that the old dam was curved downward in the centre and thus was lower than the new, which was not so curved. And he offered to prove that the master workman, when erecting the old dam, stated a reason for building it with a curve in the center. But the court held, that this evidence was inadmissible; its object was not to illustrate, explain or characterize the

act; but its purpose was to prove the fact itself, that the dam was so curved, a fact which should be proved by direct testimony, and not by declarations of the master workman, though made whilst he was building the dam. It was not a case, in which such declarations were competent evidence as a part of the *res gestæ.*

So here the declarations of the defendant are not introduced to illustrate, explain, or in any manner qualify the fact of his refusal to sign this bond; but their real and only purpose is to prove the fact itself, that he did so refuse. It cannot be so proven. It is not a case, in which such declarations can be competent as a part of the *res gestæ.*

I am therefore of the opinion that the court did not err in rejecting this evidence.

The remaining question for our consideration is: Did the circuit court err in refusing to grant a new trial in this case, because the verdict was contrary to the evidence or unsupported by the evidence? There is really no difficulty in disposing of· this question. The verdict of the jury is fully supported by the direct evidence of Thompson, corroborated by the evidence of Corder and and his former counsel and to some ·extent by the brother-in-law of the defendant, Talbott, and of Thompson, by portions of the evidence of the defendant, Talbott, himself, and also to some extent by the testimony of all the plaintiff's witnesses aforesaid, and of the brother-in-law of Talbott and Thompson to the effect that they were acquainted with Talbott's signature, and believed that the signature to the bond was his genuine signature. It is true the defendant's testimony, taken by itself, would clearly show the verdict to be wrong. · The defendant, Talbott's, evidence. is irreconcilable with the justice of this verdict; and it is a direct contradiction of the evidence of Thompson, and it is supported by the evidence of his servant, Poling, and to some extent by the evidence of the nine witnesses,

who to a greater or less extent were acquainted with the handwriting of Talbott and did not believe his signature to the bond to be genuine.

On familiar principles, often recognized by this Court in such a case of contradictory evidence sustained apparently by other evidence tending to directly opposite conclusions, the court ought not to interfere with the verdict of the jury. Had the verdict of the jury been for the defendant, it could not in such a case have been properly set aside, nor can the verdict in favor of the plaintiff be disturbed. The principles, which in such cases govern the granting of new trials, are so familiar, that it is unnecessary here to repeat them. They are illustrated by very many cases, among them by *R. F. & P. R. Railroad Co.* v. *Snead,* 19 Gratt. 354; *Campbell* v. *Lynn & Co.,* 7 W. Va. 655; *Miller* v. *Insurance Co.,* 12 W. Va. 116; *Shrewsbury* v. *Miller,* 10 W. Va., 115.

It is obvious, that in a case of so much doubt it would have been grossly unjust to have permitted the verdict of the jury to have stood, had the court refused to have permitted any proper testimony to go to the jury. But the court in this case committed no such error.

It is further contended by appellant's counsel, that the record should show affirmatively that the parties to the bond as obligors were sued separately, for if they were sued jointly, the judgment should be for or against both. The record does show clearly, that the obligors were sued separately. The parties to this suit, as shown by the record, are James W. Corder, plaintiff v. Elam D. Talbott, defendant, and not against Talbott & Thompson. This suit was instituted March 4, 1871; and the judgment was confessed by Thompson on January 30, 1871; and it is so expressly alleged in the declaration. And of course it could not have been in this suit, that this judgment was confessed.

The judgment of the circuit court rendered on the 20th day of November, 1875, must therefore be affirmed; and

the appellee must recover of the appellant his costs expended in this Court and damages according to law.

THE OTHER JUDGES CONCURRED.

JUDGMENT AFFIRMED.