# CHARLESTON.

SAMPLE *v.* CONSOLIDATED LIGHT AND RAILWAY Co.

Submitted June 24, 1901.   Decided December 14, 1901.

1. MOTORMAN—*Evidence—Injury.*
    A declaration by the motorman running on an electric car made while the car was still on the body of one it had run down, that "I saw the child, but thought I could pass it," or, "This is a terrible thing, I saw the child but thought I could run past it," is admissible in evidence as a part of the *res gestae* in an action for the injury.  (p. 476).

2. MOTORMAN—*Must Exercise High Watchfulness.*
    A motorman in charge of an electric car moving in the public street where he has reason to expect little children are playing, must exercise a high degree of watchfulness in the operation of the car.  (p. 478).

Error to Circuit Court, Cabell County.

Action by E. E. Sample, Administrator, against the Consolidated Light and Railway Company.  Judgment for plaintiff and defendant appeals.

*Affirmed.*

CAMPBELL, HOLT & CAMPBELL, for appellant.

RANKIN WILEY and PEYTON & PERKINS, for appellee.

MCWHORTER, JUDGE:

The Consolidated Light and Railway Company on the 3rd of October, 1899, being the owner and operating an electric street railway upon Third avenue in the city of Huntington, on that day by one of its cars ran down and killed a child named Charles

Jennings Lyon, two years and three months of age.  On the 7th of October, 1899, E. E. Sample was appointed administrator of said child and brought his action of trespass on the case against said company for the death of the child laying his damages at ten thousand dollars.  Defendant demurred to the declaration, which demurrer was overruled and the plea of the general issue entered, a jury impaneled.  Upon the trial of the case the jury returned a verdict in favor of plaintiff for four thousand dollars.  The defendant by counsel moved the court to set aside said verdict and grant it a new trial upon the ground that said verdict is contrary to the law and the evidence, and because the same is excessive, evincing on the part of the jury prejudice, passion, partiality and bias, which motion was overruled and judgment entered upon said verdict.  In the course of the trial the defendant tendered five bills of exceptions which were signed and saved to it and made part of the record.  The defendant obtained a writ of error, assigning seven causes of error: *first,* in overruling the demurrer to plaintiff's declaration; *second,* that the verdict was contrary to the law and the evidence; *third,* that the verdict was excessive and the court erred in not setting it aside; *fourth,* in modifying the defendant's instruction set out in first bill of exceptions; *fifth, sixth,* and *seventh* assignments relate to the admission of what is claimed to be improper testimony.

Plaintiff in error assigns no cause of demurrer and makes no mention of it in the brief of counsel for it, and the declaration seems to be sufficient.  It is claimed by plaintiff in error that the verdict of the jury is so excessive as to evince passion, bias and prejudice and therefore should be set aside.  "Four thousand dollars was given by the jury for a male child of only two years and four months of age.  Limit of ten thousand dollars in the eye of the law compensate for the most valuable life of mature manhood or womanhood, and certainly nearly one-half of that sum is excessive for a mere babe, yet to be reared and conducted through the vicissitudes of childhood, and educated and maintained."  Counsel seems to take a purely commercial view of the matter, the law does not fix a commercial value either on children or adults.  A calamity of this nature cannot be compensated for in dollars and cents.  The highest privilege that is given one in this life is to "rear and conduct through the vicissitudes of childhood, and educate and maintain" one's children; no greater source of happiness pertains to this life.  Sec-

tion 6, chapter 103, Code, relating to actions of this character provides, "In every such action the jury may give such damages as they shall deem fair and just not exceeding ten thousand dollars." This statute puts no value upon any individual, young or old, but the matter is left wholly with the jury as to what shall be deemed a fair and just amount of damages to be ascertained not to exceed the amount authorized by statute. There are many cases where verdicts similar to this have been sustained by the courts. In *Houghkirk* v. *Canal Co.,* 28 Hun. 407, the court refused to set aside as excessive a verdict for five thousand dollars rendered for the death of a child six years of age. The court in that case in its opinion says: "That the damages could be reviewed in this court. But the difficulty is, by what test are we to review them? If it is a matter of guess work, the jury can guess as well as we. If we are to review them by the test of the evidence then the difficulty is, that there is no direct evidence proving the amount of loss." The statute has wisely left it with the jury to say what the damages shall be. In *Turner* v. *Railroad Co.,* 40 W. Va. 675, (syl. pt. 5), it is held: "The action of the jury assessing damages in case of the death of a person by the wrongful act, neglect, or default of another, is not reviewable, as no damages allowed by the jury within the limit fixed by the statute can be deemed excessive, their determination of this question being absolute and exclusive as to what damages are fair and just, unless the verdict evinces passion, prejudice, partiality, or corruption on the part of the jury." There is nothing in the record in case at bar to indicate in any way that the action of the jury was not fair and impartial and void of all passion, prejudice or corruption.

The fourth assignment is the improper modification by the court as set out in bill of exception No. 3 of the defendant's instruction as follows: "The court instructs the jury that if they find from the facts and circumstances of this case that Charles J. Lyons, the father of the child that was killed by the defendant's car on the 3rd day of October, 1899, negligently permitted said child to escape into the street where it was run over and killed, and such negligence was the proximate cause of its death, then the negligence of the father must be attributed to the child, and the verdict should be for the defendant." Upon plaintiff's objection to said instruction, the court added the following words: "Unless the jury further find that the motorman, Chas.

Wade, was not exercising any care in looking out for persons upon or near the defendant's track; and that if the said motorman had been in the exercise of such care he could have discovered the child and stopped the car in time to prevent the accident." Plaintiff in error insists that the modification should have carried the idea of willful or wanton negligence on the part of defendant. The modification is sufficient, it seems to me, to carry with it the idea of criminal negligence if the jury can believe that the motorman *was not exercising any care in looking out* for persons upon and near the defendant's track. The expression contained in the modification is not "the use of ordinary care" or "reasonable care," but if he was not exercising *any* care. "A motorman in charge of an electric car moving in the public street, where he has reason to expect little children are playing, must exercise a high degree of watchfulness in the operation of the car." Black's Law and Practice in Accident Cases, s. 52, p. 56. *Traction Co.* v. *Heitman,* 61 N. J. L. 682, where it is held: "That a child two years and three months old * * * *to whom contributory negligence cannot be imputed * * * * was suffered to roam unattended in the public street, cannot relieve a traction company from liability for its negligence in the management of its car, resulting in the child's death." *Street Railway Co.* v. *Mechler,* 87 Tex. 628. The question properly arises in this case, was the defendant entitled in any event to an instruction on the question of contributory negligence on the part of the father? There is absolutely no evidence of contributory negligence unless the naked fact of the child being on the street alone could raise the presumption of negligence, on the other hand all the evidence on that point tends to prove rather unusual care on the part of the parents especially of the father. The child had been found unlatching the gate prior to this time, the parents had watched it and finding its mode of procedure to get out, the father had some month or two before the accident made special provisions for fastening the gate in a way that the child could not open it. In Thompson's new work on the Law of Negligence, Vol. 1, sec. 324, it is said, "Small children have a right to light, air and exercise, and the children of the poor cannot be constantly watched by their parents. From these considerations it follows that the mere fact that a child of tender years has been injured while at large and unattended on a public street or highway, does not necessarily impute contributory negligence to its

parents or guardian as a matter of law, but is at most only *prima facie* evidence of negligence on their part subject to explanation. The question whether they have been negligent in allowing the child to be at large is generally a question for the jury in view of the circumstances attending the particular case. Even in the case of a very young child—in one case only two years of age—if, notwithstanding the exercise of reasonable care on their part, having regard to the situation, the child escapes on the public street, and is therein injured through the negligence of another, that other must pay for the damages." *Farris* v. *Cass Avenue R. R. Co.,* 80 Mo. 325. And sec. 325 of the same work cites numerous cases of the same character. And in *Gavin* v. *Chicago,* 97 Ill. 66, s. 37 Amer. Rep. 99, where a child four years of age left its parents' house, unattended, without their knowledge or consent; the father was absent engaged in manual labor and his mother was confined to her room by sickness. While thus absent he received a personal injury. It appeared that as soon as the mother discovered its absence, she made search for it. It also appeared that the family were dependent upon their daily labor for support. It was held that a verdict exonerating the parents of the child from negligence ought not to be disturbed. In *Chicago* v. *Hesing,* 83 Ill. 204, it is held: "The giving of an instruction slightly inaccurate, but which, under the facts of the case, could not have worked to the prejudice of the party complaining or have misled the jury, will not justify the reversal of the judgment." We are unable to see under the circumstances of this case how the instruction in the form asked by defendant could possibly have changed the result. The child was too young to have any care for its safety and its parents omitted no reasonable care for its protection. If the jury had found or conceived from the evidence any contributory negligence on the part of the father or parents under the instruction as offered by the defendant, the jury must have further found under the modification made by the court of said instruction that the motorman was exercising absolutely no care in looking out for persons upon or near the defendant's track, and they must have further found that if he had been exercising ordinary care in that behalf he could have discovered the child and stopped the car in time to have prevented the accident.

The motorman's own testimony shows that the "child was about midway from the curbstone and the track," and "about

thirty or thirty-five feet from the car," and "running towards the track at kind of angle with the way that the car was coming," when he first saw the child.   Another witness for the defendant, Clyde Tanner, testifies that he was about thirty feet behind the car on his bicycle going the same way and at about the same speed the car was going, and he saw the child step off the curbstone into the street and run toward the track until it was run down by the car, while others evidently saw it before the motorman claims to have seen it and he is the only witness who was examined whose duty it was to keep an outlook and see the movements of the child from the very moment it started towards the track.   There is a good deal of conflct of testimony in regard to the relative positions of some of the parties that came on to the ground just at the time of the accident, which conflict of testimony was proper for the consideration of the jury.   According to the testimony of the motorman, and admitting that he did everything that he could, from the time that he first saw the child, to stop the car, he did nothing until the child had run half the distance from the curbstone to the street car track, when it was clearly his duty to have seen it when it left the curbstone and to have begun at once to guard against the accident.

The defendant offered the following instruction:  "The court also instructs the jury that in considering this case they must wholly disregard the evidence of Mrs. Caverlee so far as the same relates to the following statement which she attributed to motorman Wade, 'I saw the child but thought I could pass it,' also wholly disregard the evidence of witness, E. McClain as it relates to statement attributed by him to motorman Wade, to-wit: 'This is a terrible thing. I saw the child but thought I could run past it.' " set out in bill of exceptions No. 2.   The defendant also filed bills of exceptions to the rulings of the court in permitting the plaintiff to ask the witnesses Mrs. Caverlee and E. McClain the questions eliciting the answers set out in the instruction, to be asked and answered.   The question is, can the statement attributed to the motorman at the time and under the circumstances of the accident be treated as a part of the *res gestae*.   It is contended by plaintiff in error that it is not bound by the expressions of the motorman as stated by the witnesses even if true, that the statements were simply the narrative of the past event and not concurrent with the fact involved, and therefore could not be treated as part of the *res gestate* and could not have been

admitted on any other ground.  2 Jones on Evidence, s. 347, it is stated, "When declarations or acts accompany the facts in controversy and tend to illustrate or explain, they are treated, not as hearsay, but as original evidence, in other words, as part of the *res gestate*.  Thus conversation contemporaneous with the facts in controversy and explaining such fact are admissible." And authorities there cited.  The rule is laid down in 21 Am. & E. E. L. 99, as follows: "The rule is that evidence of words or acts may be admissible, (notwithstanding the general rule against derivative evidence), on the ground that they form part of the *res gestae,* provided that the act which they accompany is itself admissible in evidence, and that they reflect light on or qualify that act.  But they must be so connected with the main fact under consideration as to illustrate its character, to further its object, or to form in conjunction with it one continuous transaction.  If declarations are made some time before the act and stand alone by themselves, they are not within the rule and are inadmissible.  If they amount to no more than a mere narrative of a past occurrence or of an isolated conversation held, or an isolated act done at a later period, they are not admissible; but, if declarations of a past occurrence are made under such circumstances as will raise the reasonable presumption that they are the spontaneous utterance of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation and design, they will be admissible as part of the *res gestae*." 1 Wharton's Evidence, s. 259, states the rule substantially the same way.  1 Greenleaf on Evidence, 162*g*, says: "The willingness to receive these statements, as an exception to the hearsay rule, rests on the notion that the circumstances of the occasion so excite and control the mind of the speaker that his statements are natural and spontaneous and therefore sincere and trustworthy."  And quotes *U. S.* v. *King,* 34 Fed. Rep. 314, where the court charges the jury that: "The declarations of an individual made at the moment of a particular occurrence, when the circumstances are such that we may assume that his mind is controlled by the event, may be received in evidence, because they are supposed to be expressions involuntarily forced out of him by the particular event and thus have an element of truthfulness they might otherwise not have."  And in 14 Am. & E. E. L. 914, it is said that while it is essential that the declaration

should be contemporaneous with or at least so connected with the main fact in issue as to constitute a part of the transaction and thus derived clearly from the main fact or act itself, still it is not necessary that a declaration, to be part of the *res geslae,* should be precisely and astronomically contemporaneous and concurrent in point of time with the principal transaction, but rather that it be made voluntarily, unpremeditatedly, spontaneously, and under the immediate and unconscious influence of the principal transaction and be made at such a time, whether contemporaneous and concurrent or not, and under such circumstances and conditions as to preclude the idea of deliberate intent and design." Underhill on Evidence, s. 57, says: "Though the majority of the American decisions, however, do not require that the act and the declarations should be precisely contemporaneous provided they are otherwise connected. In many of the states the strict English doctrine is adhered to. Their unpremeditated and spontaneous character being the main ground for their reception, it is clear, on the whole that where any interval has elapsed between the act and the declaration, the likelihood that the declarant has taken advice or considered what he should say, would have a bearing on their exclusion. * * * * But, when the declaration was made soon after the event with which it was connected, it is admissible, provided a period however short, has not elapsed which would give an opportunity for a deliberation." In *Springfield Consolidated Ry. Co.* v. *Welsch,* 155 Ill. 511, it is held: "A declaration by the motorman running an electric car, made while the car was still on the body of one it had run down, that the reason he did not stop was that he could not reverse the car, is admissible in evidence as part of the *res gestae* in a suit for the injury." *Qunicy Horse Ry. Co.* v. *Gnuse,* 137 Ill. 264; *Ry. Co.* v. *Allen,* 54 Ill. App. 27; *Shafer* v. *Lacock,* 168 Pa. St. 497; *Nugent* v. *Brenchard,* 36 N. Y. 102; *Robinson* v. *Superior Rapid Transit Co.,* 34 L. R. A. 205; *Ry. Co.* v. *Vance,* (Tex. Civ. App.) 41 S. W. 167; *Houston E. & W. T. Co.* v. *Norris, Id.* 708; *Houston & T. C. Ry. Co.* v. *Weaver, Id.* 846; *R. R. Co.* v. *Jones,* (Miss.) 19 So. Rep. 91; *Wilson* v. *So. Pac.,* (Utah) 44 Pac. 1042; *Mo. Pac. Ry. Co.* v. *Baier,* (Neb.) 55 N. W. 513; *Hanna* v. *Hanna,* (Tex.) 21 S. W. 720; *Penn. R. R. Co.* v. *Lyons,* (Pa.) 18 Atl. 759; *Liveinstone's Case,* 14 Grat. 692; *Kirby's Case,* 77 Va. 681.

Plaintiff in error relies upon *Corder* v. *Talbot,* 14 W. Va. 277,

(syl. pt. 3), where it is held: "When the declarations are merely a narrative of a past occurrence, though made ever so soon after the occurrence, they ought not to be received in evidence, they being in such case no part of the *res gestae.*" In that case Judge Green shows that the declaration there sought to be given in evidence was a declaration of the party in his own favor and as the judge says, "In the case before us we have seen there is no difficulty in saying that the fact, in connection with which the defendant's declarations were proposed to be admitted, was in no manner connected with the material fact at issue in the case, that is, whether the defendant had signed the bond. The defendant's declaration, that he would not sign it, is in no manner connected with the material fact at issue. It is a circumstance, as we have seen, in itself so unconnected, that it would not have been given in evidence as direct evidence on the trial of this issue; and it was only admissible as a collateral fact to contradict one of the plaintiff's witnesses. And therefore they, being declarations of a party in his own favor, though a part of the *res gestae,* of a collateral fact introduced into the case merely to contradict a witness of the other side, but in no way otherwise connected with the material fact or enquiry involved in the issue were not admissible." And further he says: "These cases are readily distinguishable from the ordinary case of a prisoner declaring immediately after the killing of a man how he committed the act. In such a case a material part of the enquiry is, what were the prisoner's motives or feelings, and his declaration immediately afterwards tend to show these feelings; and for this reason they are admitted. They are in such case not a mere recital of a past occurrence. The act here was the refusal by the defendant to sign this bond. Such an act in its very nature cannot be illustrated, explained or characterized by any declarations of the defendant." The case of *Luby* v. *R. R. Co.,* 17 N. Y. 131, is cited by plaintiff in error and quotes from the court, "It (declaration) was not made at the time of the act so as to give it quality and character. The alleged wrong was complete when he made the statement, and the driver was only endeavoring to account for what he had done." But he fails to quote the next sentence which is, "He was manifestly excusing himself and throwing the blame on his principals." Thus clearly showing that the court excluded it because the driver had had time to fix up a story to clear himself of blame and cast it upon his prin-

cipals.  It was not a declaration made as in case at bar which
is clearly brought within the rule as laid down in the authorities
cited as being a "spontaneous utterance of thoughts created by or
springing out of the transaction itself, and so soon thereafter as
to exclude the presumption that they are the result of premedita-
tion and design."  The very nature of the declaration alleged to
have been made by the motorman in case at bar showing, if
made, that it was true because it was against himself and if ut-
tered at all must have been without thought or premeditation
and it was so soon after the accident, if it can be said at all to be
after the accident, that he had not time to think what would be
the effect of his expression, it was uttered while the thought was
still fresh in his mind, "He thought he could run past it," but
now finds that he was mistaken.

Plaintiff in error also cites *Hawker* v. *R. R. Co.,* 15 W. Va. 628,
to show the approval by Judge Green of the said case of *Luby*
v. *R. R. Co.,* cited.  We find in the same case on page 638 where
Judge Green cites with approval the case of *R. R. Co.* v. *Coyle,*
55 Pa. St. 402, where a pedlar's cart had been overthrown by a
railroad car and a suit instituted by him for the injury;  the
plaintiff was permitted by the court below to prove the declaration
of the engineer at the time of the accident, for the purpose of
showing the train was behind time, and thus show carelessness
and negligence as a part of the *res gestae.*  Judge Green says,
"The supreme court says: 'The record shows no bill of exceptions
to this evidence; but if it did, we cannot say that the declaration
of the engineer was no part of the *res gestae.*  It was made at the
time of the accident, in view of the goods strewn along the road
by the breaking up of the boxes; and it seems to have grown
directly out of and immediately after the happening of the fact.
The negligence complained of being that of the engineer him-
self, we cannot say that his declaration, made upon the spot,
at the time, and in view of the effects of his conduct, are not evi-
dence against the company as a part of the transaction itself.' "
This was a case in which the declarations of the engineer were
made after the accident was complete "in view of the goods
strewn along the road by the breaking up of the boxes; and it
seems to have grown directly out of and immediately after the
happening of the fact," and as it was against the engineer him-
self showing his own negligence the court admitted it in evi-
dence against the company as a part of the transaction itself.

It would be hard to conceive of a case more perfectly illustrating facts and circumstances of the case at bar, the declarations of the motorman, if made, were made immediately after the happening of the accident and while the child was yet under the car mangled and crushed to death; the motorman up to that time not having sufficiently recovered himself to fabricate a story which would exonerate him from blame, and under the first impulse, feeling that the facts were patent to everyone, only stated what is almost certainly the truth and which is the most plausible explanation of the transaction that could have been made. If he had seen that child starting from the curbstone to run towards the track as soon as others saw it, and as it was his duty to see it, he would undoubtedly have at once applied the forces for stopping the car and must have succeeded before striking the child because he admits in his testimony that it was half way from the curb to the track when he discovered it and began to stop the car, and even at that late time he was within a few feet of stopping it before the collision occurred. Plaintiff in error cites two Massachusetts cases, *Lane* v. *Bryant,* 9 Gray 245, and *Williamson* v. *R. R. Co.,* 144 Mass. 148, which come more nearly supporting his contention than any other cases he cites, but the great preponderance of authorities is against him. He referred to the case of *O'Brien* v. *R. R. Co.,* 119 U. S. 99, and quotes very largely from the opinion in that case written by Justice Harlan. It is there held: "The declaration of the engineer of the locomotive of a train which meets with an accident, as to the speed at which the train was running when the accident happened, made between ten and thirty minutes after the accident occurred, is not admissible in evidence against the company in an action by a passenger on the train to recover damages for injuries caused by the accident." It will be observed that these declarations excluded were made some time, from ten to thirty minutes, after the accident occurred and even in that case Justice Field wrote a dissenting opinion in which Chief Justice Waite, Justice Miller, and Justice Blatchford concurred    In which dissenting opinion they refer with approval to the case of *R. R. Co.* v. *Coyle, supra.* This opinion was rendered in 1886. In 1897 Justice Harlan wrote the opinion in the case of *Pierce* v. *VanDusen,* 78 Fed. Rep. 693, in which it is held: "Where a railroad employe has been injured by the movement of cars about which he was at work, statements of the conductor of the train, made al-

most immediately, and while the cars were moving or had just stopped, and while the injured man was bleeding from the injury at that moment received, describing his own part in bringing about the motion that effected the injury, are admissible, on the trial of an action for such injury, as part of the *res gestae.*"

It is seen there can be no fixed inflexible rule as to what declarations and assertions are a part of the *res gestae* in every transaction, but the facts and circumstances must to a large extent control in each individual case. While the evidence to prove or tending to prove the declarations of the motorman as part of the *res gestae* was clearly admissable under the circumstances of this case, the evidence is sufficient to sustain the verdict without it. The motorman saw the child and vainly thought he could run past the point where the child would reach the track before it reached it, or, he failed to see it in time to save it. If he had seen it from the moment it left the curbstone as it was seen by witness, Clyde Tanner, who was riding on his bicycle behind the car, as was his duty to see it, he would have had good time to have stopped the car and would have done so, but the child had run half the distance according to the motorman's own testimony before he saw it, and the fact that he at that late time only lacked a few feet of having the car stopped in time to have prevented the collision makes it clear that if he had seen it when he should have seen it, *i. e.,* when it started from the curbstone, he would have had ample time to have stopped the car before the accident. One of a motorman's highest duties is to keep a proper lookout for persons and especially for children on and about the track; *Gunn* v. *Railroad Co.* 43 W. Va. 676, (680, 681), of which case, syl. pt. 3 is as follows: "The engineer and fireman of a railroad train must keep a careful lookout on the track ahead to discover persons and animals upon it, and use ordinary care to avoid injury to them." This applies to railroad moving trains through the country, the required care is certainly no less in moving an electric car on the streets of a populous city when children may be expected to be playing on the streets. *R. R. Co.* v. *Ormsby,* 27 Grat. 455." "A railroad company running its cars through a populous street of a city, on which many children live, must omit nothing which can be done by the company and its agents to prevent injury to children on the street;" and it is there further held, syl. pt. 3, that "A child two years and ten months

old cannot be capable of contributory negligence, so as to relieve a railroad company from liability for its own negligence." *Felton* v. *Newport*, 105 Fed. Rep. 332, syl. pt. 3, it is held: "The mere fact that a lookout was maintained on an engine, as required by statute, and that he did not see a person on the track, does not exonerate the railroad company from liability for the killing of such person, but it must further appear that the lookout could not have seen him in the exercise of due care and watchfulness." The question in case at bar is how is it possible for the motorman not to have seen the child until it was halfway across the street towards the track, and yet he says he did not sooner see it.

I see no error in the judgment and the same is affirmed.

### UPON PETITION FOR REHEARING.

Plaintiff in error in its petition for rehearing insists that by the decision of this case a too rigorous rule is laid down with reference to the duties of a motorman on an electric car, which rule is based upon defendant's instruction set out in bill of exception No. 3 as modified by the court by the words added to the instruction as follows: "Unless the jury further find that the motorman, Charles Wade, was not exercising any care in looking out for persons upon or near the defendant's track; and if the said motorman had been in the exercise of such care he could have discovered the child and stopped the car in time to prevent the accident." The comments made upon said instruction and the words added thereto by the court are here referred to as they appear in the decision. Plaintiff in error based his criticism on said holding upon the testimony of Mr. Osgood who says that he saw the child when "it was standing in the street about four feet from the curb. Almost opposite Mr. Lyon's gate." That it was standing facing towards the car track, that it was still standing there when the car obstructed his view, he being on the opposite side of the street. Petitioner says: "This is the only witness that saw the child before it was seen running towards the track. The child did not move nor show any indication of moving while it was in Osgood's sight, and did not move until the car had passed between the witness and the child, and obscured it from his vision. This witness was 135 feet east of the point where the child was struck, on the opposite side of the street, walking in the street

four feet from the curb. It follows as a mathematical certainty that while the child was yet standing still the car would have to run half the distance between them before it cut off Osgood's sight of the child. Half of this distance would be sixty-seven and one-half feet. So we have positive and uncontroverted evidence introduced by the plaintiff that *the child was standing perfectly still, giving out no indication or intention of moving one way or the other at the time when the car was running at full speed only sixty-seven and one-half feet away from the point of collision."* He also quotes the evidence of Mrs. Caverlee where she says to the best of my knowledge it (the child) was not more than midway between the curbstone and the street car track when she discovered it and that the car was slowing when she saw it and the child was running diagonally to the track in the same direction as the car was going.

In reply to petitioner. saying that Osgood was the only witness who saw the child before it was seen running toward the track, Clyde Tanner, a witness for petitioner, who says he was riding on his wheel about thirty feet behind the car, that when he first saw the child it was coming off the sidewalk and running toward the car, that he did not see it stop in the street, that he was on the same side of the track that the child was on and it was where he could see it all the time. Wade, the motorman, says when he first saw the child it was about midway from the curbstone to the track running toward the track at a kind of an angle with the way the car was going. So that if it was true that the child was standing in the street four feet from the curb it had run ten to twelve feet toward the track from where it was standing in plain view of the motorman before he saw it, so that it is beyond question that if the motorman had seen the child when it was his plain duty to see it, he had ample time to have stopped the car before the collision.

Petitioner says: "This car was running about eight feet per second, and if the car was stopped within 65 or 70 feet from the time that the child was last seen standing still, *as all the evidence shows that it was,* then the car was stopped within less than ten seconds after the child was last seen standing still." This statement carries with it its own refutation. If true the child, only two years and three months of age, ran twenty-seven feet while the car ran sixty-five or seventy feet! An impossibility.

Petitioner cites several authorities to show what a motorman's duties are in relation to children near the curbstone, as for instance, "He is not bound to bring his car to a full stop merely because he sees a child five or six years old on the sidewalk to guard against possible accident;" and "Where a child is crossing the track of an electric railway the motorman of a car, which is running at a reasonable speed, is not bound to take into consideration the possibility of the child falling;" and further "Where a child was playing in the gutter and gave no indication of an intention to cross the track until the car was within about ten feet of the place where it attempted to cross, it was held that the motorman was not chargeable with negligence for failure to slacken the speed of the car;" and again "An electric street railroad company is not liable for injuries caused to children where they suddenly and unexpectedly come upon the track so immediately in front of an approaching car that it is impossible to stop the car in time to prevent striking them." *Stabenan* v. *R. R. Co.*, 155 N. 511; *Murry* v. *Patterson R. R. Co.*, 61 N. J. L. 301; *Balti. City R. R. Co.* v. *Cooney*, 87 Md.; *Fleischman* v. *Neversink R. R.*, 174 Pa. State 510; Joyce on Electrical Law, sec. 588. No one questions the corectness of these principles but I am unable to see how they are "directly in point" as claimed by the petitioner. Petitioner says "Objects that are stationary do not catch the eye like those that are moving, and when this child was standing still out by the curbstone, where Osgood saw it, it was doing nothing, making no motions to attract his attention, but the instant it moved in the direction of the track it caught his eye and he must have seen its first motion for it would have been impossible for him to have been doing what was necessary to check the speed of the car while the child was going eleven feet, had he not commenced instantly on the child taking the first step toward the car." This statement is directly in the face of the evidence of the motorman himself who says when he first saw it it was about midway from the curbstone to the track and was running toward the track. There is nothing contained in the petition for rehearing that would indicate that any new light beneficial to the cause of the petitioner could be thrown upon the case if the prayer of the petition should be granted, the rehearing is therefore refused.

*Affirmed.*