STATE OF WEST VIRGINIA

*v.*

GARY L. YOUNG

(No. 14143)

Decided December 19, 1980.

*Lane O. Austin, Sanders & Austin, Billy E. Burkett, Veneri & Burkett,* for plaintiff in error.

*Chauncey H. Browning*, Attorney General, *Homer A. Speaker*, Assistant Attorney General, for defendant in error.

McGRAW, JUSTICE:

The appellant, Gary L. Young, was convicted in the circuit court of Mercer County of first degree murder after the shooting death of his ex-wife, Pamela Young and was sentenced to life imprisonment without the opportunity for parole. He assigns several grounds as error and asks for a new trial. He objects to certain jury instructions and argues that the lower court erred in admitting into evidence statements made by the deceased before and after the incident. He also objects to the admission of other testimony and contends that the lower court should have granted him a change of venue. We find merit in some of the grounds he assigns and award him a new trial.

Gary was nineteen and Pamela was sixteen when they were married February 7, 1968. On their wedding night, Pamela bore their daughter Lisa but the couple told no one about the child, desiring to keep the birth secret. Gary then moved to Charleston with the baby and Pamela remained in school in the Princeton area. Gary found a woman to care for the child in Charleston and got a job. He also attended college in Montgomery. On the couple's first wedding anniversary, Gary was hitchhiking from Montgomery to Princeton to see Pamela when the car in which he was riding was involved in a serious accident. Gary suffered a broken neck and spinal cord injury which rendered him a quadriplegic. His lower extremities, hands, and fingers are completely paralyzed. He does have the use of his arms, shoulders and neck. Gary spent almost two years in Charleston undergoing treatment and rehabilitation therapy. During much of this time, Pamela lived in Charleston and attended beautician's school. In January of 1971, the couple moved to Pamela's parent's home in Pinoak and she got a job in a beauty shop. The existence of the child had become known to their families shortly after the automobile accident and Gary spent most of his time with her baby sitting.

The couple contemplated divorce while Gary was in the hospital. At his trial, Gary testified that he wanted Pamela to make her own life: that she was young and could start again. The State introduced evidence that Gary was bitter because of his condition and resentful of his wife. The couple separated in October of 1973 and were divorced in February of 1974. The divorce, however, was not final until April of 1975.

Just before 10:00 a.m. on January 21, 1976, Pamela Young was about to enter a bowling alley in Bluefield to attend her regular bowling league. As she got out of her car, a dark blue car pulled in behind hers. Taylor Moore, the owner of the B & T Quick Mart located next to the bowling alley, was looking from the window of his store when he noticed the car pull in behind Pamela Young's car. Mr. Moore saw acts which led him to conclude that there was a conversation between Pamela Young and the occupant of the blue car.[1] According to his testimony, the person in the car thrust a red and white package towards Pamela. Before she took the package, it jumped "a couple of times".[2] Pamela stepped back from the car, clutched her abdomen and ran into Taylor Moore's store, exclaiming that she had been shot and that the rescue squad should hurry because she was dying. Moore called the rescue squad and the police and returned to Pamela, who, at this point, was lying on the floor in front of the checkout counter. Moore asked her her name and she responded. He then asked her who shot her and she answered, "my ex-husband." Moore asked, "What was his name?" She replied, "Gary". He asked her if Gary's

_____

[1] Over defense counsel objection, a witness who was on her way from the parking lot to the bowling alley testified that Pamela asked the driver of the car in an aggravated voice, "what are you doing here"? Another witness, also on her way from the parking lot to the bowling alley, testified that she saw Pamela speaking to the driver of the blue car but she was unsure of what Pamela said. Both parking lot witnesses were unable to identify the driver of the car at a line-up but did testify that the driver was male.

[2] One of the parking lot witnesses testified that while her back was turned, she heard what she thought were two or three gunshots. She turned around and saw the victim lean over, clutch her abdomen and run into the B & T Quick Mart.

last name was the same as hers and she responded, "Yes, Young".

Pamela Young was taken to the Bluefield Sanitarium. Medical personnel determined that one bullet had penetrated the top of her right breast, exited the bottom of the breast and reentered her body through her abdomen. Due to profuse internal bleeding, her veins had collapsed and in order to give her blood, it was necessary for the medical team to perform what is termed a "cut-down"; a procedure used to find a vein when the veins collapse. Medical testimony indicated that Pamela was in shock and languid, but she was conscious during these procedures.

Shortly after she was brought to the hospital, Detective Sergeant James Dent of the Bluefield Police Department arrived there. After learning of Pamela's condition, he spoke with her. "Pamela I know this is a terrible thing to ask at this time, but do you believe that you are going to die?", Dent inquired. Pamela responded, "Yes, I do". Detective Dent then asked her, "Pamela, I ask you again, who shot you?" Pamela said, "My ex-husband, Gary Young." Shortly after this colloquy, Pamela Young submitted to emergency surgery. She never regained consciousness and early the following morning she died.

I

The principle assignment of error is that the trial court over objection, gave an instruction impermissibly shifting the burden of proof to the appellant as to a material element of the crime. More specifically, the appellant contends that State's Instruction No. 4 violates the principles enumerated in *State v. Pendry*, 159 W.Va. 738, 227 S.E.2d 210 (1976) and its progeny, specifically *State v. O'Connell*, 163 W. Va. 366, 256 S.E.2d 129 (1979).

In its brief, the state confesses that the instruction given was erroneous. While confessions of error do not automatically entitle a party to reversal, *Gibson v. Bechtold*, 161 W.Va. 623, 245 S.E.2d 258 (1978); *State v. Cokeley*, 159 W.Va. 664, 226 S.E.2d 40 (1976), reversal is required when it can be ascertained that the errors confessed are supported by law. *State v. Cokeley, supra.* " 'In a criminal case where the

State confesses error, urges that the judgment be reversed and that the defendant be granted a new trial, this Court, upon ascertaining that the errors confessed are reversible errors and do in fact constitute cause for the reversal of the judgment of conviction, will reverse the judgment and grant the defendant a new trial.' Syl. *State v. Goff*, 159 W.Va. 348, 221 S.E.2d 891 (1976)"; *State v. Cokeley*, 159 W.Va. 664, 226 S.E.2d 40 (1976). In the instant case, the State properly recognized that the instruction violates the rule on presumptions laid down in *Pendry, supra,* and *State v. O'Connell, supra.* Accordingly, we accept the State's confession of error, reverse the judgment of the court below and award the appellant a new trial.

This ruling, however, does not relieve us from addressing some other substantial issues raised by the appellant. Specifically, he contends that the lower court erred in admitting into evidence the statement made to Taylor Moore, the store owner, immediately following the shooting and the statement made to Detective Dent just before Pamela Young underwent surgery. The appellant also argues that the lower court erred in admitting testimony concerning a threat made by the appellant which was directed to a person other than the victim. He also contends that the lower court should have granted his motion for a change of venue.

## II

Taylor Moore's testimony concerning his colloquy with Pamela Young was admitted into evidence by the trial court as part of the res gestae, under the spontaneous exclamation exception to the hearsay rule. The appellant, however, contends that the victim's statement lacks the requisite spontaniety to be admissible under the exception. He argues that the statement was too removed from the event to assume that it was made without deliberation. He also argues that because the statement was made in response to questions posed by Mr. Moore and was made in a calm and deliberate manner, it was the product of reflection and design: a design intended to falsely implicate the appellant.

Spontaneous exclamations are admitted into evidence as one of the better known exceptions to the hearsay rule on the assumption that a person stimulated by the immediacy of an exciting act and acting under the influence of that act will lack the reflective capacity essential for fabrication. *Sample v. Consolidated Light R. R. Co.*, 50 W. Va. 472, 40 S.E. 597 (1901). While the rule appears simple, the historical origins of the spontaneous exclamation exception have caused many courts to struggle in developing criteria to determine the admissibility of such statements. The difficulty in the development of this exception is marked by its constantly changing nomenclature. *See*, Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 60 (1978). As professor Cleckley notes, courts have often used the term res gestae in connection with such doctrines as spontaneous exclamation, fresh complaint, and present sense impression. Cleckley, *supra.* Professor McCormick indicates that the term res gestae is more generic than particular and includes within its definition four distinct exceptions to the hearsay rule. He states that included within the term res gestae are: declarations of present bodily condition; declarations of present mental state and emotion; excited utterances; and declarations of present sense impression. McCormick, *Evidence* § 274 (Cleary, ed., 1972).

In West Virginia the spontaneous utterance exception to the hearsay rule grew out of what is termed the verbal act rule. As originally conceived, the verbal act rule was limited to declarations made during the transaction and did not include any declarations which were made after the act. *Beckwith v. Mollohan*, 2 W. Va. 477 (1868). The essence of the verbal act rule was that the declarations had to be made contemporaneously with the transaction. By being an integral part of the transaction, verbal acts were part of the res gestae which literally translates, "things done." *Elswick v. Charleston Transfer Co.*, 128 W. Va. 241, 36 S.E.2d 419 (1945). In *Sample v. Consolidated Light & R. R. Co.*, 50 W. Va. 472, 40 S.E. 597 (1901), we moved away from the strict requirement of contemporaneity in favor of a less technical approach based more upon the spontaneity of the

utterance than upon its timing. This departure from the traditional verbal act rule was firmly established in *Starcher v. South Penn Oil Co.*, 81 W. Va. 587, 95 S.E. 28 (1918) where the court held admissible a declaration made sometime after the occurrence in question. *See also, Blagg v. Baltimore & O. R. R. Co.*, 83 W. Va. 449, 98 S.E. 526 (1919). The *Starcher* opinion was strongly criticized in Note, *Spontaneous Exclamation v. Res Gestae*, 25 W. Va. L.Q. 341 (1918), as not adherring to the strict requirements of the res gestae verbal act rule. The writer labeled the term 'res gestae' a "mystic shibboleth". The *Starcher* opinion, however, did not represent an unwarranted expansion of the verbal act rule. Rather, *Starcher*, at least inferentially, solidified and amplified the distinction between the verbal act rule as one part of the res gestae doctrine and spontaneous exclamations as another res gestae exception to the hearsay rule. This distinction has not gone unnoticed by the courts and legal scholars.[3] *See, e.g., People v. Caviness*, 38 N.Y.2d 227, 379 N.Y.S.2d 695, 342 N.E.2d 496 (1975); *Haney v. State*, 129 Miss. 486, 92 So 627 (1922); *Mayes v. State*, 64 Miss. 329, 1 So. 733 (1886); *Jones v. State*, 71 Ind. 66 (1880); Wigmore, *Evidence*, 3d ed. § 1745; Hardman, *supra*, Note 3; Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 60 (1978).

As the distinction between the verbal act rule and the spontaneous exclamation exception to the hearsay rule became more pronounced, courts were left with the task of developing factors by which they could test an exclamation for spontaniety. This task certainly included a reevaluation of the role that the time element would play.

A review of the numerous decisions discussing the length of time between the event and the utterance as it relates to admissibility would lead even the most diligent scholar into a morass of cases from which no firm rule concerning

---

[3] The writer of the note critical of *Starcher* went on to become Dean of the West Virginia University College of Law. While Dean, he wrote another article, thirty-four years after the first, in which he acknowledged the viability of the spontaneous utterance exception but reaffirmed his criticism of the term res gestae. Hardman, *Spontaneous Declarations (Res Gestae)*, 54 W.Va. L.Rev. 93 (1952).

time can be derived. Indeed, one reference source, Annot. *Accusatory Utterances*, 4 A.L.R.3d 149 (1965), classifies cases into categories where the statement was made within ten minutes of the incident, from ten minutes to thirty minutes of the event, from thirty minutes to one hour after the occurence, more than one hour after the incident and where the interval of time from the incident to the statement was not disclosed in the opinion. Most reported decisions, however, have one firm rule which this court noted early on in *Ellis, et. al. v. Dempsey*, 4 W.Va. 126 (1870). There we said, "it is perhaps not possible to lay down any general rule as to what is part of the *res gestae* which will be decisive of the question in every case, in which it may be presented by the ever varying phases of human affairs." 4 W.Va. at 128. It is clear, however, that the test is spontaneity, not contemporaneity. *Collins v. Equitable Life Insurance Company*, 122 W.Va. 171, 8 S.E.2d 825 (1940).

Perhaps the best explanation that can be offered for the varying opinions concerning spontaneous exclamations as they are affected by time considerations lies in the fact that many courts, while abandoning the strict requirements of the verbal act rule, failed to clearly articulate what other factors they would consider in ruling on the admissibility of spontaneous exclamations. While quite obviously, courts have employed other factors, the identification and application of those factors resulted in a legal patchwork not easily decipherable.[4]

---

[4] Many courts avoid setting out rigid factors, implicity acknowledging that each case turns on its facts. In *Pickelseimer v. State*, 154 Ga. 223, 267 S.E.2d 845 (1980), the court ruled admissible the statements of a seven year old girl made to her mother ten minutes after she was released by the defendant who had earlier molested her. The court noted that the statements were made as soon as practical after the victim was released from the defendant's dominion. *See also, State v. Cox,* ___ S.C. ___, 266 S.E.2d 784 (1980); *Wallace v. State*, 151 Ga. App. 171, 295 S.E.2d 172 (1979); *Tucker v. State*, 243 Ga. 683, 256 S.E.2d 365 (1979) (utterance not made to first person seen after incident but made to another within one hour of the incident held admissible); *Leonard v. State*, 146 Ga. App. 439, 246 S.E.2d 450 (1978) (statement made to neighbor within minutes of fatal shooting held admissible). The South Carolina court took the opportunity to explain the interrelationship between the contemporaneity of the statement and other factors in

West Virginia was not immune from the confusion which resulted during the process of distinguishing the verbal act rule from the spontaneous utterance exception to the hearsay rule. In an attempt to construct a framework for evaluating spontaneous exclamations and partly in response to the confusion generated by the intermingling of the generic term "res gestae" and the specific term "spontaneous utterance", *see Hardman, supra,* we adopted in *Ward v. Raleigh County Park Board,* 143 W.Va. 931, 105 S.E.2d 881 (1958) a six factor test for determining the admissibility of spontaneous exclamations set out by the Washington court in *Beck v. Dye,* 200 Wash. 1, 92 P.2d 1113 (1939). In *Ward,* we stated that to determine admissibility, an alleged spontaneous declaration must be evaluated in light of the following factors:

> (1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the

*State v. Blackburn,* 271 S.C. 324, 247 S.E.2d 334 (1978). In *Blackburn,* the court ruled that the fact that the utterance of the victim was made more than one hour after the incident did not render it inadmissible per se. The court here said that the statement was inadmissible because it dealt with the reasons for the assault rather than the account of how it occurred. In any event, the length of time between the event and the utterance has been held to render a statement inadmissible in numerous cases where the length of time coupled with the nature of the statement illustrates that the declaration was an after thought, showing reflection, and not a spontaneous utterance. *See, e.g., Williams v. State,* 144 Ga. App. 130, 240 S.E.2d 890 (1977) (narrative made two days after assault held inadmissible); *Clark v. State,* 142 Ga. App. 851, 237 S.E.2d 459 (1977) (narrative of assault victim made after repeated questions held inadmissible as spontaneous exclamation).

occurence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation; and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made. 143 W.Va. at 937, 105 S.E.2d at 885.

The appellant does not question the validity of this six factor test. He agrees that the statement of Pamela Young to Taylor Moore relates to the main event and that it is not a narrative of the incident or a statement of opinion. He does contend, however, that because the statement was made calmly in response to questions and was made almost five minutes after the incident, it lacks spontaneity and reflects instead deliberation and premeditation. After examining the record in light of these contentions, we think the trial court correctly admitted the statement based on our prior holdings. In *Collins v. Equitable Life Insurance Company*, 122 W.Va. 171, 8 S.E.2d 825 (1940) we held admissible a statement made within ten minutes of the event giving rise to the statement. In *Lawrence v. Nelson*, 145 W.Va. 134, 113 S.E.2d 241 (1960), *disapproved on other grounds, Yates v. Mancari*, 153 W.Va. 350, 168 S.E.2d 746 (1969), a statement made several minutes after an automobile accident was held admissible. In *Starcher v. South Penn Oil Company, supra*, the court properly admitted the statement of the plaintiff uttered when he regained consciousness sometime after the event although his reply was in response to a question. *See also, Pickelseimer v. State*, 154 Ga. App. 223, 267 S.E.2d 845 (1980); *State v. Cox*, S.C., 266 S.E.2d 784 (1980); *Wallace v. State*, 151 Ga.App. 171, 259 S.E.2d 172 (1979); *Tucker v. State*, 243 Ga. 683, 256 S.E.2d 365 (1979); *Leonard v. State*, 146 Ga. App. 439, 246 S.E.2d 450 (1978); *State v. Blackburn*, 271 S.C. 324, 247 S.E.2d 334 (1978); *State v. Johnson*, 294 N.C. 288, 239 S.E.2d 829 (1978); *Robertson v. Coal & C. Ry. Co.*, 87 W.Va. 106, 104 S.E. 615 (1920); *Blagg v. Baltimore & O. R.R. Co.*, 83 W.Va. 449, 98 S.E. 526 (1919).

Less than five minutes elapsed from the time of the shooting until the statement was made. Pamela knew she

was gravely wounded as she told Moore to tell the rescue squad to hurry because she was dying. The fact that she appeared calm, while relevant to our inquiry, is not fatal to the admissibility of the statement. One suffering from an ultimately fatal wound, losing blood, obviously under the influence of the transaction and perhaps in shock cannot be expected to behave in a manner which cultivates the prejudices of those with preconceived notions of what the outward signs of excitement should be. *See, State v. Barnes,* 124 Ariz. 586, 606 P.2d 802 (1980).

The fact that the statement was in response to questions posed by Taylor Moore is not fatal to its admissibility either. The questions, whether or not they were leading, were predictable and cannot be said to have cast Pamela Young into such a state of mind as to influence her reply. She most likely had more compelling thoughts. In *State v. Coram,* 116 W.Va. 492, 182 S.E. 83 (1935), we said that "interrogation alone does not exclude a reply from the *res gestae,* but the question should not prompt the answer". 116 W.Va. at 495, 182 S.E. at 85. *See also, Lawrence v. Nelson, supra; Starcher v. South Penn Oil Company, supra.* In the instant case, the questions of Mr. Moore were prompted by Pamela Young's declaration upon entering the store that she had been shot. While Taylor Moore's question concerning her husband's last name can be seen as somewhat leading, within the context of their exchange, it appears to be a logical response to a somewhat unclear prior answer.

The New York court addressed the issue of the effect of questions on the admissibility of spontaneous declarations in *People v. Edwards,* 47 N.Y.2d 493, 392 N.E.2d 1229 (1979). There the court observed:

> The natural reaction of any person arriving to aid one exposed to a startling event is to inquire, "What happened?". To pivot the admissibility of a subsequent statement, however spontaneous, on the question of whether it was prompted by an equally spontaneous inquiry would serve no useful purpose. Instead, this is merely one of the factors to be weighed in determining whether the sur-

rounding circumstances demonstrate that the utterance was instinctive. To be sure, if the question propounded or the identity of the questioner may suggest or influence the response or if it is asked an appreciable length of time after the startling event, the declarations might very well lack the inherent reliability basic to the rule. 392 N.E.2d at 1232.[5]

*See also, State v. Barnes, supra.*

In light of the foregoing, we think the trial court was correct in admitting into evidence the statements of Pamela Young to Taylor Moore. In any case, the trial court is vested with broad discretion concerning the admissibility of such declarations. *Ambrose v. Young*, 100 W.Va. 452, 130 S.E. 810 (1926); *People v. Edwards, supra*; *Powers v. Temple*, 250 S.C. 149, 156 S.E.2d 759 (1967).[6]

### III

The appellant next contends that Pamela Young's statement made to Detective Dent while at the hospital does not qualify as a dying declaration and, as such, was improperly admitted by the trial court under that well known exception to the hearsay rule. We disagree with the

---

[5] For examples of the type of questions which strongly taint the spontaneity of an exclamation, *see, Goins v. Commonwealth*, 218 Va. 285, 237 S.E.2d 136 (1977) where the court ruled inadmissible the statements of the victim made in response to a policeman's inquiries fifteen minutes after the event. The court ruled similarly in *Nicholaou v. Harrington*, 217 Va. 618, 231 S.E.2d 318 (1977). *See also, Clark v. State*, 142 Ga. App. 851, 237 S.E.2d 459 (1977). *See generally*, Annot. *Accusatory Utterances*, 4. A.L.R.3d 149 (1965). *But see, State v. Quillien*, 263 S.C. 87, 207 S.E.2d 814 (1974), (statements made in response to police officer's questions held admissible).

[6] The appellant also argues that the statement of Pamela Young, "what are you doing here?", overheard by one of the parking lot witnesses should not have been admitted. We disagree. The statement, while not admissible as a spontaneous utterance, is admissible under the venerable verbal act rule set out in *Beckwith v. Mollohan, supra*. The New Jersey court made a similar ruling in *State v. Driver*, 38 N.J. 255, 183 A.2d 655 (1962). There, the court held admissible as part of the res geste a statement overheard by the victim's wife made by him shortly before the event. The statement, "oh you guys", was admitted as tending to show that the victim knew his assailants.

appellant and hold that the statement was properly admitted.

Primarily, the appellant argues that there was insufficient evidence that Pamela Young was conscious that death was near and certain. In support of this contention, the appellant cites the testimony of several witnesses who were with Pamela at the time the declaration was made. The testimony of these witnesses indicates that no one told Pamela that she was going to die. The evidence also shows that Pamela hesitated a moment before responding to Detective Dent's inquiry as to who shot her. One nurse told her that she would be all right. As Pamela was being taken to surgery, she told her mother, "By mom, I love you. I'll be seeing you."

In *State v. Meek*, 107 W.Va. 324, 148 S.E. 208 (1929), we set out the rules governing the admissibility of a dying declaration. To be admissible, an alleged dying declaration

> '[m]ust have been made under the realization and solemn sense of impending death ... must have been the utterances of a sane mind ... must be restricted to the homicide and the circumstances immediately attending it, and forming part of the *res gestae* ... is not admissible unless it would be competent and relevant if it were the testimony of a living witness; and ... [g]reat caution should be observed in the admission of dying declarations, and the rules which restrict their admission should be carefully guarded.'
>
> 107 W.Va. at 328-29, 148 S.E. at 209-10.

The question of what constitutes a "solemn sense of impending death", was addressed by us before *Meek* in *State v. Clark*, 64 W.Va. 625, 63 S.E. 402 (1908). There we stated that to determine if the declarant was in the article of death, the trial court should consider the nature of the victim's wounds, the victim's condition at the time of making the declaration and the length of time between the declaration and declarant's death. *See also, State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966); *State v. Barker*, 128 W.Va. 744, 38 S.E.2d 346 (1946); *State v. Sauls*, 97 W.Va. 184, 124 S.E. 670 (1924). The fundamental rule which can be

derived from all these cases is that the trial court should evaluate all the circumstances surrounding the declaration when determining admissibility. *State v. Clark, supra.*

We think that in the instant case, Pamela Young was conscious of impending death. She answered Detective Dent's inquiry as to whether she thought she was going to die by saying "Yes I do". The fact that she subsequently submitted to surgery does not fatally taint the declaration. In the recent case of *Commonwealth v. Boccella*, 405 A.2d 923 (Pa. Super. Ct., 1979), the Pennsylvania court ruled admissible a statement made before the declarant submitted to emergency surgery. Pamela's request of the nurses that they do something to help her does not fatally taint the declaration either. In *United States v. Etheridge*, 424 F.2d 951 (6th Cir., 1970), *cert. denied*, 400 U.S. 993, 91 S.Ct. 463, 27 L.Ed.2d 442 (1971), *rehearing denied*, 401 U.S. 926, , 91 S.Ct. 885, 27 L.Ed.2d 830 (1971), the court noted that a request by the declarant that someone call an ambulance is not indicative of a hope for recovery but may result from a natural desire to be relieved of pain. To the same effect, *see, Jones v. State*, 38 Md. App. 288, 380 A.2d 659 (1978).

Pamela's comment to her mother, while seemingly indicative that Pamela had not abandoned all hope of recovery, cannot, by itself defeat the admissibility of the declaration. The trial court may well have agreed with the state that Pamela's comment, "I'll be seeing you", was merely a spontaneous remark to comfort her obviously upset mother.

When reviewing the decisions of this court concerning the evidence necessary to show consciousness of impending death, we should remember that the rule requiring abandonment of all hope of survival was formulated at a time when the medical arts were not as well developed as they are today. We note with interest the comments of the Alaska court on this point.

> We believe that to require that the declarant have abandoned all hope of recovery is overly demanding. In light of modern medical science it is rare indeed that all hope of recovery is abandoned, yet a victim may be aware of the probability that

his death is impending to the extent necessary to create sufficient solemnity to give adequate assurance of the trustworthiness of his testimony. What is required for a dying declaration to be admissible is that the declarant have such a belief that he is facing death as to remove ordinary wordly motives for misstatement. In that regard, the court may consider the totality of the circumstances of motive to falsify and the manner in which the statement was volunteered or elicited."

*Johnson v. State,* 579 P.2d 20 (Alaska 1978).

Without explicitly so ruling, some courts have *sub silentio,* dismissed the abandonment of all hope rule where the evidence, taken as a whole indicates that the victim believed death was upon him. *State v. Unger,* 362 So.2d 1095 (La. 1978). In *Unger,* the fact that the victim stated "help me", did not, in light of all the evidence, contradict the belief that "death was upon him".[7] The law pertaining to

---

[7] The appellant also contends that the lower court erred in refusing to allow certain testimony proffered by him which was intended to discredit the dying declaration. In general, the appellant's evidence, vouched in the record, concerns the birth of the couple's child. He wanted to show that Pamela was so ashamed and embarrassed at the birth of a child conceived out of wedlock that she went to great extremes to hide the child's existence. The appellant contends that such evidence would show that Pamela was acutely sensitive to public opinion and thus, would implicate Gary in order to conceal her involvement with another man.

Dying declarations may be impeached in the same manner as other testimony. Annot. 40 Am.Jur.2d, *Homicide* § 390 (1968); Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 63 (1978). As professor Cleckley notes, there are no cases on point in this jurisdiction which deal with the impeachment of a declarant. Accordingly, we must evaluate the proffered evidence in light of traditional evidentiary rules. The state contends that the evidence surrounding the birth of the child is irrelevant and too remote to have any probative value. We agree.

The Federal District Court has stated that "[t]o determine whether these exhibits are relevant, we must first examine the proposition which is sought to be proved by their admission." *United States v. American Cyanamid Co.,* 427 F.Supp. 859, 862 (S.D.N.Y. 1977). Judged under this standard, we fail to see how the birth of Pamela's child and her attempts to conceal the birth reflect on her veracity. The fact that there is no evidence in the record that Pamela had any extensive

the admissibility of dying declarations does not require that one in extremis abandon all hope in fatalistic resignation but rather, requires that one believe that he is moving across the inevitable threshold into eternity.

We think the trial court, after conducting an inquiry into the matter, properly ruled that Pamela Young was conscious of impending death. In any case, we have held that the ruling of the trial court on such a question should not be disturbed on review where there is legal evidence to support the ruling, unless the ruling was clearly wrong. *State v. Meek, supra, State v. Clark, supra.* We cannot say today that the lower court was clearly wrong in admitting the statement as a dying declaration.

## IV

The appellant also contends that the lower court erred in admitting, over objection, testimony concerning a threat made by the appellant to a third party. While attending classes at Concord College, Gary was assisted in getting around campus by another student, Hugh Riley. At trial, Mr. Riley testified on direct examination, that he had not seen Gary or Gary's car at the college on the day of the murder, even though he was supposed to meet Gary at a pre-arranged time. On cross-examination, defense counsel sought to show that Mr. Riley had been late meeting Gary on several occasions and that he could have possibly missed Gary that day. On redirect-examination, the prosecutor

---

romantic interests refutes the appellant's contention that she may have lied to protect another man. In any case concerning the relevency of proffered testimony, this court will not overturn the ruling of the trial court in the exercise of its discretion. *Antonowich v. Home Life Insurance Company*, 116 W.Va. 155, 179 S.E. 601 (1935). The proffered evidence is simply too remote as well. While it has been stated that remoteness does not usually affect admissibility but, rather, goes to the weight given the evidence, *Arbogast v. Vandevander*, 161 W.Va. 731, 245 S.E.2d 620 (1978), evidence can be so remote as to warrant its exclusion. *State v. Spencer*, 97 W.Va. 325, 125 S.E. 89 (1924). Unless the trial court clearly abused its discretion in the matter, this court will not find error. *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945). For interesting discussions on the impeachment of dying declarations, *See State v. Stevens*, 295 N.C. 21,243 S.E.2d 771 (1978); and *Wilson v. State*, 86 Nev. 320, 468 P.2d 346 (1970).

asked Mr. Riley: "Did he [the appellant] ever tell you what he would do to you if you were late?" Mr. Riley answered, "During the finals, he told me one time he would kill me if I was late . . ." We agree with appellant that this testimony was improperly admitted.

The rule in West Virginia regarding threats made by one accused of a homicide was laid down in *State v. Corey*, 114 W.Va. 118, 171 S.E. 114 (1933). There, we held that it was proper to admit evidence of a threat made against one other than the victim "provided, of course, there is a connection between the threat and the crime". 114 W.Va. at 121, 171 S.E. at 115. In syllabus point 2 of that case we said in part that "[a]s a general rule, an expressed intent of an accused to kill a certain person is not pertinent on his trial for killing another, but it may become pertinent and admissible under circumstances showing a connection between the threat and subsequent conduct of accused . . . where both persons are killed at the same time in pursuance of an evinced intent to kill both . . ."

This holding follows the general rule set out in the annotations that

> threats made by one accused of a homicide to kill or injure some person other than the deceased, or having no reference to the deceased, which are not connected with the murder, are not admissible as evidence against the accused. Such threats are admissible against the accused in a homicide case only under circumstances which show some connection between the threats and the injury inflicted on the deceased.
>
> Annot. 40 Am.Jur.2d *Homicide* § 318 (1968).

The instant case bears no resemblance whatsoever to the circumstances in *State v. Corey, supra.* In *Corey*, the defendant's threat to kill his wife was admitted into evidence at his trial for killing another woman. The connection between the threat and the murder was established because at the same time the defendant murdered the other woman, he also murdered his wife. Here, the threat to Mr. Riley was absolutely unconnected with the murder of Pamela. The rule requiring a connection

between the threat and the murder has been employed by most courts. *See, e.g., State v. Kotsimpulos*, 411 A.2d 79 (Me. 1980); *State v. Martin*, 371 So.2d 1319 (La. 1980); *State v. Moses*, 367 So.2d 800 (La. 1979); *People v. Howell*, 53 Ill. App.3d 465, 368 N.E.2d 689 (1977); *State v. Eaton*, 309 A.2d 334, (Me. 1973); *State v. Rice*, 188 Neb. 728, 199 N.W.2d 480 (1972). The admission into evidence of a threat so unconnected to the principal event, as in the case here, is indeed erroneous. Whatever possible probative value existed in the testimony is far outweighed by its inflammatory and prejudical effect.

In light of the fact that we are granting the appellant a new trial, we need not address the issue concerning the refusal of the lower court to grant the appellant a change of venue. Such a motion may be addressed to the proper court upon retrial of the cause. *Hovermale v. Berkley Springs Moose Lodge No. 1483*, 165 W.Va. 689, 271 S.E.2d 335 (1980). The appellant's other contentions are without merit and need not be discussed.

*Reversed and remanded.*