The defendant was tried in the common pleas court of Cabell county upon the charge of murdering Thomas Stafford. He was found guilty of murder in the first degree, with a recommendation of punishment in the penitentiary. He was sentenced to life-time imprisonment by the trial court. The circuit court of Cabell county found no error in the judgment and the defendant obtained a writ of error here.
The defendant and the deceased were on bad terms. They owned contiguous properties, and the deceased had claimed that it was difficult to keep his property rented because of bees and dogs kept by the defendant. At one time the defendant had paid the deceased $25.00 as damages for loss of tenants. The killing seemingly grew out of the demand of *Page 326 
the deceased for additional damages. The evidence discloses threats by each against the life of the other. The defendant claims that the deceased had shot at him prior to the day of the homicide, and on the morning of that day attempted to enforce his demand for additional damages with a pistol. The tragedy occurred on a street in Huntington. There were no eye witnesses. The defendant testifies that he was walking along the sidewalk and was overtaken by the deceased in an automobile. The defendant's description of the affair is as follows: "His car was about the length of the hood in front of me. He stopped with the door of his car right opposite me * * * within about a foot of the curb, the wheels of the car, and says 'Stop there Meek.' * * * I wheeled around facing him * * * and he says 'You going to give me any of that money?' He said 'I will kill you, God damn you,' threw his hand back this way, and I shot him twice just as quick as I could do it."
A dying declaration of the deceased was admitted in evidence, which is as follows: "Questions by Dr. Kappes; and Jas. N. Quinlan, Atty. Q. Now, Tom, tell us all about how you got shot, where it happened and everything you know about it. Where were you when the shooting occurred? A. 17th St. and 11th Ave. (Pause) Q. Go on, tell us all about it? A. The time the trouble started, was about the 11th of June. Had been having trouble for sometime about bees and bee hives on adjoining lot. Had about three, four or five hives and stands. Along in the spring, I wanted this man Meeks to give me some, he said he would but he didn't. I was over there and the hives were empty. I went down and put up Five ($5.00) Dollars, and I went over and said to this man Green V. Meeks, I said it was all ready. When I went over I was talking to Mr. Meeks, and he put his hand on the door, and I had asked the Mayor and he said for Meeks to move them, and I was talking about that, and wanted to know what could be done. The Mayor wanted me to set the damages to the property and he said to see if we could get matter adjusted without a law suit. I went on home. Q. Did you have a gun with you? A. I didn't have a gun with me. The only gun I have was at home in the pillow. I met Mr. *Page 327 
Meeks on the street and we commenced to talking about the trouble and he began to get mad, and he said he would pay part, for me not to cry, and he told me x x I didn't hit him and I didn't have a gun. He said I was stingy, and I said, 'No, Mr. Meek x x I said I am not afraid of no man, I told him to get along, only thing I said x x (pause) I am so tired, so tired, I can't talk. Q. Go on and tell us how Meek happened to shoot you. A. He said I was stingy, and I said I would tell him how to get some money and I said x x I said I was not stingy, and I gave him (Meek) a dollar, and I said, 'I will give a Hundred Dollars to the Church (Holiness) Mr. Meek, if you will,' and he turned and went in the house and I came on home and went up stairs and got my hat. Q. Go on and tell us what happened after that. A. I was sitting in the car and Meeks came along and met me on 17th St. and x x he began to swear and reached in and got his gun, and I did not have a gun and it was at the house under pillow. He just shot me. I was on the south side of the avenue east of 17th St. A lot of women and children there. Q. Did you make any attempt to strike this man? A. No offense at all. Never tried to hit him at all. He shot two times, and I asked, 'For God sake Mr. Meek, don't shoot me.' Shot me two times, once in the hand and then in the right side, you can see. They drove up to the hospital with me and I said to get Dr. Vest. Q. What made him draw the gun? A. I just said I would give a hundred dollars and that was what made him mad. Meek's bees were on my property and I asked him if he was going to move them. The tenants moved because the bees had been after the people. We had a law suit and Jno. Perry was my lawyer, and they could not move them on account of the danger, and I told them that was satisfactory, so when the Mayor gave the order x x. Q. What time in the morning did you get shot? A. Eleven o'clock."
This declaration was written from notes of Mrs. Ann Rady, a stenographer. She testified that she was at the bedside of the deceased about 4:35 P. M., of the day he was shot; that Quinlan asked the deceased "if he realized that his hope of living was but a few hours longer"; that the deceased replied, *Page 328 
"Yes, I know that I do not have long"; that she then took down in shorthand all the questions asked and the answers of the deceased and that the double x appearing at several places in the declaration indicates incomplete sentences. Quinlan does not mention in his testimony that he interrogated the deceased as to his condition, but states his recollection to be that Dr. Kappes said in effect to the deceased that he didn't have long to live. Dr. Kappes' testimony on this point is: "I said, 'Mr. Stafford, you are going to die.' And he merely said, 'Oh, I don't know,' as though he didn't believe anything I said at all."
Error is charged to the admission of this declaration. Much eloquent ink spreads the altruistic theory that a sense of imminent death has a beneficent effect upon the veracity of the declarant. See Hill v. State, 41 Ga. 484. An equal or greater amount perhaps has flowed in opposition to that theory. Railing
v. Com., 110 Pa. 100. In practice, such declarations have been found to furnish an "unreliable and unsatisfactory character of proof", and juries are accustomed to attach to them "undue importance." Mitchell v. State, 71 Ga. 128. "Dying declarations have every element of dramatic evidence", says Wharton, and as such "they possess an impressiveness out of all proportion to their evidentiary value." Wharton's Crim. Ev. (10th Ed.), p. 529. They have been termed "a dangerous innovation" upon the rules of evidence. Marshall v. C. G. R.R. Co., 48 Ill. 475, 95 Am. Dec. 561, 563. But they are tolerated upon the grounds of necessity and public policy. 1 R. C. L., p. 529, sec. 70; 30 C. J., p. 252, sec. 495. Consequently, courts are admonished that the facts upon which their admissibility depends should be closely scrutinized, and the rules environing their admission should be stringently applied. 4 Ency. Ev. 945-6. In Lipscomb v. State, 75 Miss. 559, a leading case, those rules are summarized as follows: "(a) They must have been made under the realization and solemn sense of impending death; (b) They must have been the utterances of a sane mind; (c) They must be restricted to the homicide and the circumstances immediately attending it, and forming a part of the res gestae; (d) A declaration, or part of it, is not *Page 329 
admissible unless it would be competent and relevant if it were the testimony of a living witness; and (e) Great caution should be observed in the admission of dying declarations, and the rules which restrict their admission should be carefully guarded."
Some courts have at times apparently lost sight of the distinction between the admissibility of evidence and its weight and credibility after admission. Consequently, there are some decisions, which, in effect, permit the jury to pass on the admissibility of dying declarations. 1 R. C. L., p. 536, sec. 79. We are of opinion, however, that both wisdom and the weight of authority support the view that what constitutes a dying declaration is a question of law to be passed on exclusively by the court. It is the general rule that courts should determine all questions relating to the admission of evidence. Greenleaf on Evidence (16th Ed.), p. 162-3; Wigmore on Evidence, (2nd Ed.), sec. 2550. We see no sound reason for excepting the admission of dying declarations from the general rule. "The relevancy and admissibility of dying declarations are questions solely for the court." Wharton's Crim. Ev.,supra, sec. 275-6; Bishop's New Crim. Pro. (2nd Ed.), sec. 1212; 4 Ency. Ev. 948-9; 10 A. E. Ency. Law 384;; Elliott on Ev., sec. 355; Wigmore, supra, sec. 1451; Thompson on Trials (2nd Ed.), sec. 327; Vass v. Com., 3 Leigh 786, 794; State v.Cain, 20 W. Va. 679, 684. "The question being one of law, it is a proper subject for review on appeal or upon writ of error." Wharton, supra, sec. 296a; Donnelly v. State, 26 N.J.L. (2 Dutcher) 463, 498; State v. Zorn, 202 Mo. 12, 36.
It is contended by counsel for the defendant that the evidence of Dr. Kappes shows clearly that the statements of the deceased were not made under the realization of impending death and for that reason a sufficient predicate was not established for their admission as a dying declaration. See 30 C. J., 263; 1 R. C. L., p. 537, sec. 80. It is not of controlling importance that we as a Court might have come to a different conclusion as to this fact. The ruling of the trial court on such a question will not be disturbed on review where there is legal evidence to support it unless it is clearly erroneous. *Page 330 
4 Ency. Ev. 979; McBee v. Deusenberry, 99 W. Va. 176. While the evidence of Dr. Kappes furnishes ground for debate as to whether deceased realized his condition, the evidence of Mrs. Rady that deceased said he did, is sufficient legally to justify the ruling. Therefore we cannot say that the trial court was clearly wrong upon this point.
Dr. Walter E. Vest, a physician who saw the deceased immediately before the statement was taken, states that in his opinion the mind of the deceased was clear at that time. Counsel contend that despite the opinion of the physician, the statement itself shows that the deceased was not in control of his mental faculties. The statement charges that the trouble began about the bees, but within a few lines says the hives were empty. There is no connection between the statement that the declarant put up $5.00 and the other details narrated. There is apparent confusion between the conversation alleged to have been had with the defendant and one with the mayor. At one place the declarant says that following his offer to give a hundred dollars to the church the defendant turned and went in the house and "I came on home", etc.; at another, that the offer made the defendant mad, caused him to draw his gun and (by inference) immediately preceded the shooting. Which, if either, is correct? The declarant says there were women and children at the place where he was shot. That statement is not correct. There is no coherence in the unfinished statement commencing "We had a law suit." Other incoherencies could be pointed out. It appears from the evidence that it had been necessary to give the deceased a large quantity of morphine to allay his suffering prior to the time his statement was taken. Mrs. Rady estimated that the declarant consumed thirty to thirty-five minutes in making it. The effect of shock and of the drug pervades this entire statement. Such a declaration is not rendered inadmissible from the fact that declarant was under the influence of opiates, where his statement is connected and rational. Taylor v. State, 38 Tex.Crim. 552; Com. v. Straesser, 153 Pa. 451. But this declaration fails as to these requirements. It is not connected and is frequently irrational. It demonstrates conclusively that the mental balance *Page 331 
of the declarant was dethroned, and accordingly should have been excluded. 4 Ency. Ev. 933; 30 C. J., p. 278, sec. 518; 1 R. C. L., p. 532, sec. 74; Jolley v. State, 130 Tenn. 286; annotation commencing p. 404, 56 L.R.A.
The admission of the declaration was manifest error and causes a reversal of the case. A discussion of the other allegations of error is therefore unnecessary except to say that we find no error in the instructions given and refused.
Reversed; new trial awarded.