386 S.E.2d 823

**STATE of West Virginia**

v.

**William GARRETT.**

No. 18627.

Supreme Court of Appeals
of West Virginia.

March 13, 1989.

Dwight J. Staples, Henderson & Henderson, Huntington, for appellant.

Charles G. Brown, III, Attorney Gen., Charleston, for appellee.

BROTHERTON, Justice:

This case is before the Court on the appeal of the appellant, William Garrett, who was found guilty of first degree sexual assault and kidnapping by the Cabell County Circuit Court. On September 5, 1986, the appellant was sentenced to a period of confinement in the West Virginia Penitentiary of not less than ten nor more than twenty years for the first degree sexual assault conviction and life imprisonment for the kidnapping conviction. The sentences were to run consecutively. This proceeding is the appellant's appeal from the Cabell County Circuit Court's final order of June 23, 1987, which affirmed the verdict and sentence.

On November 23, 1983, the alleged victim, Mary Elliott, left the Time–Out runa-

way shelter in Huntington, West Virginia, to see her boyfriend, who was employed at the Cabell–Huntington Hospital. After talking with her boyfriend for approximately forty-five minutes, Ms. Elliott left the hospital and began walking down 16th Street on her way back to the runaway shelter. Ms. Elliott claimed that at approximately 11:30 p.m., the appellant, William Garrett, approached her at the corner of 10th Avenue and 16th Street and asked her if she wanted to "go party," to which she replied "no." She then testified that the appellant grabbed her by the arm and took her to his house, which was located on the corner of 10th Avenue, where he raped her. At approximately three or four o'clock in the morning, the appellant and Ms. Elliott walked from his house to his mother's house, located at 11th Avenue, where they stayed until approximately 7:00 a.m. She reported that she was again raped.

Ms. Elliott later testified that she escaped at about noon the following day, wearing only a blanket. She was spotted by a Huntington City employee, who placed her in the truck and radioed for help. She was taken to the hospital, where she was examined and treated by Dr. Cesar Ibanez.

By contrast, the appellant testified that he asked Ms. Elliott for a date at approximately 10:00 p.m. She turned him down, instead leaving in a gray Pontiac station wagon with a man named "Steffon." The appellant claimed that he next saw Ms. Elliott at approximately 3:00 a.m. at the corner of Dalton Avenue and Hal Greer Boulevard. The appellant then testified that they conversed as follows:

> Why don't you come over to my house and party? and in between the conversation of unspoken clarity I asking for a date and the body language in the walk that says, yes, well, we can go party; and then I asked her in English again about the time we got to the corner of 10th Avenue.... She said "yes."

Transcript, Vol. 2 at 216–7. The appellant stated that Ms. Elliott voluntarily went with him to his house, where they attempted to have sex, although he stated "sex didn't really come off." Shortly thereafter,

they went to his mother's home to avoid "Sticks," a local pimp. They again attempted to have sex, although it is not clear from his testimony whether they ever succeeded. The appellant then testified that they walked back to his house early the next morning, where they took a bath. Sometime that morning, she ran from the house, leaving her clothes behind.

The appellant was arrested at his mother's house by police officers with an arrest warrant after the mother consented to a search of her home. Initially, the police were unable to find the appellant. However, as they pretended to leave the house, the appellant emerged from a linen closet. After the appellant had been arrested and handcuffed, he directed the officers to obtain a tape which was in a box in the closet in his room so that he could tell his "side" of the incident because he was afraid of racial prejudice.

Prior to trial, on February 21, 1984, and January 2, 1986, the appellant's counsel moved for a psychiatric examination. Judge Alfred Ferguson granted the motions and ordered the appellant transported to Huntington State Hospital for the purpose of determining his competency to stand trial and his mental condition on the date of the alleged crime. The appellant had been previously treated for chronic paranoid schizophrenia at the Huntington State Hospital in 1975 and Patton State Hospital in California in 1981. While in California in 1981, the appellant was charged with destruction of property. The charge was later dismissed because of the psychological recommendation that the appellant could not cooperate in a rational manner with an attorney in his own defense.

On April 25, 1984, the appellant's counsel filed a notice with the court pursuant to West Virginia Rules of Criminal Procedure, Rules 12.2(a) & (b), that he intended to rely on the insanity defense. Pursuant to the court order, the appellant was examined by Curtis L. Barrett, Ph.D., a psychologist at the University of Louisville. Dr. Barrett interviewed the appellant and his family on April 11, 1984 and May 8, 1984. Dr. Bar-

rett diagnosed a paranoid-type schizophrenic disorder, but concluded that the appellant met the standards for competency to stand trial. He noted that the stress of trial could cause his condition to decompensate. Dr. Barrett suggested that counsel for the appellant consider raising the insanity defense in Mr. Garrett's case. He noted, however, that the appellant argued that he simply was not guilty and had asked his attorney to proceed on that basis.

The appellant was also examined at the Huntington State Hospital on July 18, 1984, on an outpatient basis. Psychiatrist B. M. Hirani, M.D., diagnosed paranoid-type schizophrenia. He found that while the appellant was "mentally ill," he was also competent to stand trial and assist his attorney in his defense. He concluded that the appellant was not suffering from mental illness to the extent that he lacked the "substantial capacity to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of the law."

The appellant was then admitted to Weston State Hospital on January 16, 1985, for evaluation. In a report dated January 28, 1985, William J. Fremouw, Ph.D., also diagnosed chronic paranoid schizophrenia. He concluded that the appellant was competent to stand trial although he noted a potential problem with the appellant testifying on his own behalf, as the appellant had a tendency to ramble. With careful questioning, however, Dr. Fremouw felt the appellant could be kept from launching into delusional beliefs. Dr. Fremouw reported the appellant scored ninety on the Georgia Test for competency to stand trial, noting that seventy was the minimum score needed. He also found the appellant had a reasonable degree of knowledge of the nature and object of the charge and proceedings, reporting the appellant stated his defense was "[i]ts my word against hers. I had intercourse with her. There are no bruises, no weapons and no internal trauma. Therefore there is no force." Dr. Fremouw also stated the appellant knew rape was wrong. He concluded the appellant's thought disorder did not significantly impair his competency to stand trial or affect his criminal responsibility.

Prior to the trial, appellant's attorney moved to withdraw as counsel since the appellant claimed his counsel was incompetent. The attorney advised the judge of his efforts on the appellant's behalf and stated the appellant had been offered a plea of third degree sexual assault, which would have made him available for parole immediately. However, the appellant rejected the plea, insisting that he was not guilty. The court denied the attorney's motion to withdraw, finding no reason not to proceed since the attorney had contacted the appellant on numerous occasions and had attempted to use an insanity defense, obtaining extensive psychological testing on the appellant. The appellant's attorney did not raise the insanity defense at trial, instead arguing Ms. Elliott went with the appellant willingly.

In pretrial proceedings, the appellant requested individual voir dire. The trial judge denied that request and proceeded with a general voir dire. The judge also denied the appellant's request that several specific questions be asked on voir dire. Instead, the court asked the jury panel a general question concerning racial bias.

At trial, the appellant's mother testified that she heard no noise or sounds of struggle, although she was upstairs at the time. The appellant's nephew, age seventeen, testified that he went downstairs at approximately 6:30 a.m. that morning and saw the appellant and Ms. Elliott lying on the floor together, both awake. He testified that she said nothing to him to indicate she was being held against her will. The appellant testified that Ms. Elliott came with him willingly, although it was not clear whether the attempts at sexual intercourse were successful. Ms. Elliott testified that the appellant forced her to go with him to both his and his mother's house, where he raped her. Dr. Ibanez testified that his examination revealed vaginal abrasions consistent with forcible or prolonged sexual intercourse or a "straddle-type" injury.

The appellant's counsel opposed the admission of the tape surrendered by the

appellant. Although the tape was admitted into evidence, it was never played at trial nor was the transcript of the tape ever read into evidence. The jury did not hear the contents of the tape, nor were they permitted to play it in the jury room. Prior to the admission of the tape, the arresting officer testified that the tape had been in his possession since it was obtained and that it had not been changed or altered in any way. He also expressed the opinion that the voice on the tape was the appellant's. At trial, the officer testified that on the tape, the appellant stated he and the alleged victim had had sexual intercourse. The appellant did not deny making the tape, instead noting that the tape was a "rough draft" and he did not have a chance to make it clearer. He also stated he made the tape because he knew "it was a rape the minute ... she stepped out the door with the blanket," although he maintained she was willing.

Thereafter, on July 8, 1986, the jury found the appellant guilty of first degree sexual assault and kidnapping. On September 5, 1986, the court sentenced the appellant to consecutive terms of not less than ten nor more than twenty years for the first degree sexual assault conviction and life imprisonment on the kidnapping conviction. This proceeding is the appellant's appeal from the final order of the Cabell County Circuit Court on June 23, 1987, which affirmed the verdict and the sentencing.

The appellant presents several issues to this Court for review. The appellant argues that the trial court erred in rejecting the voir dire questions prepared by his attorney which addressed in detail the question of racial bias. The appellant next alleges ineffective assistance of counsel because of his trial counsel's failure to request a competency hearing and to raise the insanity defense at trial. The appellant also presents the issue of whether the tape, introduced but not played at trial, was properly seized pursuant to the *Miranda* requirements and admitted into evidence. Finally, the appellant asserts the prosecutor improperly expressed a personal opinion during closing arguments.

### I.

The first issue we address is the appellant's contention that the trial court erred in failing to ask the following voir dire questions:

(1) Do you know interracial couples?

(2) Do you know any black men personally?

(3) Do you approve in the abstract of interracial couples?

(4) Have any of your children ever dated someone of a different race?

(5) Have you ever dated someone of a different race?

(6) Do you feel that in most interracial couples, where the male is black, that the female supports him financially?

(7) Do you feel that black men as a whole prefer to date white women?

(8) Do you feel that a black man would do almost anything to get a white woman?

(9) Do you feel that black men are more likely to commit crimes than white men?

(10) Do you feel that black men live in a society more sexually oriented than white men, as a whole? and

(11) If the evidence in this case was inconclusive on the issue of consent, would you have any problem in returning a not guilty verdict because the complainant was a young white girl and the defendant was an adult black man?

Transcript, Vol. 1 at 15. Instead, the court asked the jury panel the following question:

Now, in this case the defendant is black. The alleged victim is a white woman. Because of that fact alone does that cause anybody any problem or would anybody assume this defendant is guilty because of that relationship whatsoever?

In other words, what I'm trying to find out are you prejudiced against the defendant simply because it is a white woman that has charged him with kidnapping and rape in this case.

The United States Supreme Court addressed the issue of the sufficiency of voir

dire questions in *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), in which a black man was sentenced to death for the murder of a white shopkeeper. Prior to voir dire, the defendant's counsel submitted a list of proposed questions, including the following question:

> The defendant, Willie Lloyd Turner, is a member of the Negro race. The victim, W. Jack Smith, Jr., was a white Caucasian. Will these facts prejudice you against Willie Lloyd Turner or affect your ability to render a fair and impartial verdict based solely on the evidence?

*Id.* at 30–31, 106 S.Ct. at 1685, 90 L.Ed.2d at 33. The judge rejected the question, instead asking whether any member of the jury was aware of any reason why he could not render a fair and impartial verdict. At that time, no one on the panel knew the victim was white. *Id.*

The defendant sought habeas corpus with the Federal District Court for the Eastern District of Virginia. That court affirmed the lower court's ruling, noting that in *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), the United States Supreme Court had held that in crimes involving interracial violence, an inquiry into racial prejudice during voir dire was not constitutionally mandated because the facts of the case " 'did not suggest a significant likelihood that racial prejudice might infect [the defendant's] trial.' " 476 U.S. at 32, 106 S.Ct. at 1686, 90 L.Ed.2d at 34 (quoting *Ristaino,* 424 U.S. at 598, 96 S.Ct. 1017, 47 L.Ed.2d 258.) 476 U.S. at 32, 106 S.Ct. at 1686, 90 L.Ed.2d at 34. The Fourth Circuit affirmed the district court's opinion and the appellant appealed.

■ The United States Supreme Court reversed, noting that because of the "complete finality of the death sentence" and the range of discretion entrusted to a jury in a capital sentencing case, "a unique opportunity" existed for racial prejudice to operate undetected. 476 U.S. at 35, 106 S.Ct. at 1687–88, 90 L.Ed.2d at 35–36. The Court therefore concluded a capital defendant accused of an interracial crime was

entitled to inform the panel of the race of the victim and to question prospective jurors on racial bias. The Court also indicated, however, that the rule was intended to be "minimally intrusive," stating that in cases involving " 'special circumstances,' the trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively." 476 U.S. at 36–37, 106 S.Ct. at 1688, 90 L.Ed.2d at 37.

■ Like *Turner,* the case before us involves a capital offense.[1] It is clear, therefore, that the appellant is entitled to inform prospective jurors of the race of the victim and to question the panel on racial bias. Consequently, we must address the issue of whether the voir dire questions asked about racial bias satisfied the requirements of *Turner.*

■ Unlike *Turner,* however, the trial judge in this case questioned the panel on racial bias and informed the panel of the race of both the victim and the defendant. Crucial to our decision is the fact that in *Turner,* the question which the trial court erred in refusing to ask is very similar to the voir dire question actually asked in this case. In fact, the question at issue is more extensive than that rejected by the trial court in *Turner.*

We believe the intent of the Supreme Court in *Turner* has been satisfied by the voir dire questions asked in this case. While both this case and *Turner* involve capital offenses, this situation lacks an important element influential in the *Turner* decision—the "complete finality of the death sentence." *Id.* at 35, 106 S.Ct. at 1688, 90 L.Ed.2d at 35–36. Without that finality, the necessity for such complete safeguards is, in part, lessened. In light of the discretion afforded the trial judge by the Supreme Court in *Turner,* we find no error in the trial court's refusal to ask the specific questions proffered by the appellant.

---

**1.** In *Thomas v. Leverette,* 166 W.Va. 185, 273 S.E.2d 364, 367 (1980), we determined that the crime of kidnapping, which results in a sentence of life imprisonment, is a capital offense.

## II.

The appellant next asserts that he was denied effective assistance of counsel at the trial level in violation of Article III, § 14 of the Constitution of West Virginia and the Sixth Amendment to the United States Constitution. Specifically, he points to the failure of his trial counsel to request a competency hearing and to raise the insanity defense at trial. We are not persuaded by this assertion and find no ineffective assistance of counsel.

The elements necessary to maintain a claim of ineffective assistance of counsel are found in *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). In *Thomas*, this Court held that the party charging ineffective assistance of counsel must prove, by a preponderance of the evidence, that "no reasonably qualified defense attorney would have so acted in the defense of an accused" where the actions involve strategy, tactics, or arguable courses of actions. *Id.* 157 W.Va. at 666, 203 S.E.2d at 461. A proven counsel error resulting in the deprivation of a constitutional right will be considered harmless only if there is no reasonable possibility that the error contributed to the conviction. *Id.*

We do not believe that the appellant has proved that no reasonably qualified defense attorney would have failed to request a competency hearing or raise the insanity defense in this situation. From a review of the record, it is clear the trial counsel seriously considered using the insanity defense, going so far as notifying the court on April 25, 1984, of a defense based on the appellant's mental condition. On at least two separate occasions, trial counsel requested court ordered psychiatric examinations regarding the appellant's competency to stand trial and criminal responsibility. At least three separate examinations were performed, all of which reported that while mentally ill, the appellant was competent to stand trial.[2] After reviewing these results, trial counsel determined not to proceed on the basis of insanity. Coupled with the fact that the appellant steadfastly and vehemently maintained his innocence because of the victim's alleged consent, we believe the trial counsel's plan was a researched and reasoned trial strategy that another similarly situated, reasonably qualified defense attorney might well have chosen.[3]

The appellant argues that according to *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), he had a due process right to a competency hearing prior to trial. *Pate* involved a defendant who was convicted of murder without a sanity hearing despite sufficient evidence to raise a "bona fide doubt" as to his sanity and competency to stand trial. *Id.* at 385, 86 S.Ct. at 842, 15 L.Ed.2d at 822. The defendant did not request a sanity hearing, which was provided for by Illinois law, nor were any psychiatric reports obtained regarding the defendant's sanity.[4] The United States Supreme Court ruled that given the defendant's past history, the trial court's failure to inquire into his competency to stand trial deprived him of his constitutional right to a fair trial. The Court stated that the State of Illinois "jealously guards this right" to a fair trial, noting the Illinois statute which provided for a sanity hearing.[5] *Id.* The Court concluded that "[w]here the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial," the trial judge must, on his

---

**2.** Only Dr. Barrett's report found that the appellant's attorney "should *consider* raising the insanity defense," while the remainder found that he was able to appreciate the criminality of his conduct.

**3.** Trial counsel noted that the appellant rejected a plea of third degree sexual assault, which carried the sentence of one to five years, insisting on his innocence because of Ms. Elliott's alleged consent.

**4.** The defendant's family testified that he had a history of disturbed behavior. The only psychological evidence introduced in *Pate* was a stipulation that the Director of the Behavior Clinic for Cook County Criminal Court would testify, if called, that the defendant knew the nature of the charges against him and was able to cooperate with his counsel, although no opinion was expressed as to sanity. 383 U.S. at 383–84, 86 S.Ct. at 841, 15 L.Ed.2d at 821.

**5.** Ill.Rev.Stat. C. 38 § 104–2 (1963).

own motion, "impanel a jury and conduct a sanity hearing" as required by Illinois statute. *Id.*[6]

While we agree that additional due process measures are required where the defendant's past mental history raises a "bona fide doubt" as to his competency, the result obtained in *Pate* can be distinguished from the case at hand. The Illinois Code mandated a sanity hearing upon a showing of incompetency.[7] We find no parallel right to a mandatory sanity hearing in the West Virginia Code.[8] In *State v. Audia,* 171 W.Va. 568, 301 S.E.2d 199 (1983), *cert denied,* 464 U.S. 934, 104 S.Ct. 338, 78 L.Ed.2d 307 (1983), this Court interpreted W.Va.Code § 27–6A–1 (1986) to require a competency hearing only where the psychiatric evidence revealed he was unaware of his legal rights and not able to participate in his defense.[9] Specifically, we found "no evidence in the [psychiatric] reports which would indicate that the appellant was not competent to stand trial. On the contrary, the psychiatric findings showed that he was very aware of his legal rights, and was able to offer much assistance in the preparation of his defense." *Id.* 171 W.Va. at 576, 301 S.E.2d at 207.[10]

We do not believe the United States Supreme Court intended that every state require a sanity hearing before a jury upon evidence of possible incompetence.[11] Rather, we believe the Supreme Court's intent in *Pate* was to require whatever procedural safeguards embodied in that state's statute when a "bona fide doubt" existed as to the defendant's competency. Those safeguards, of course, must be sufficient to ensure the defendant a fair trial. Since three psychiatrists and psychologists examined Garrett at his attorney's request and reported that the appellant was competent to stand trial, we believe the procedural safeguards found in the West Virginia

6. *See also People v. Sephus,* 46 Ill.2d 130, 262 N.E.2d 914 (1970), in which the Illinois court addressed the issue of what constituted a "bona fide doubt" for the purpose of the statute. The court concluded that there was no error in failing to hold a fitness hearing where there was psychiatric testimony that the defendant could understand the proceedings and was able to cooperate with his attorney.

7. Ill.Rev.Stat. C. 38 § 104–2 (1963).

8. West Virginia Code § 27–6A–1 (1986) provides, in part, that:

(a) Whenever a court of record, or in the instance of a defendant charged with public intoxication a magistrate or other judicial officer, believes that a defendant in a felony case ... may be incompetent to stand trial or is not criminally responsible by reason of mental illness, mental retardation or addiction, it may at any stage of the proceedings after the return of an indictment or the issuance of a warrant or summons against the defendant, order an examination of such defendant to be conducted by one or more psychiatrists, or a psychiatrist and a psychologist, or in the instance of an individual charged with public intoxication, an alcoholism counselor:

\* \* \* \* \* \*

(d) Within five days after the receipt of the report on the issue of competency to stand trial, or if no observation pursuant to subsection (b) of this section has been ordered, within five days after the report on said issued following an examination under subsec-

tion (a) of this section, the court of record shall make a finding on the issue of whether the defendant is competent for trial. A finding of incompetence for the trial shall require proof by a preponderance of the evidence. Notice of such findings shall be sent to the prosecuting attorney, the defendant and his counsel. If the court of record orders or if the defendant or his counsel on his behalf within a reasonable time requests a hearing on such findings, a hearing in accordance with section two [§ 27–6A–2] of this article shall be held by the court of record within ten days of the date such finding or such request has been made.

9. *See State v. Myers,* 167 W.Va. 663, 280 S.E.2d 299 (1981).

10. In *Audia,* we ruled that it was pointless for the trial judge to order a competency hearing where the evidence did not raise a question of the defendant's competency to stand trial. 301 S.E.2d at 207.

11. In *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the United States Supreme Court noted that:

There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Id.* at 180, 95 S.Ct. at 908, 43 L.Ed.2d at 118.

Code were satisfied.[12] We find no due process right to a competency hearing where the evidence shows the appellant was aware of his rights and able to participate in his defense. In light of our interpretation of W.Va.Code § 27–6A–1 (1986) in *Audia* and the psychiatric examinations performed, we conclude there was no error in the failure to hold a hearing on competency.[13]

### III.

The appellant next argues that the tape, which he intended to tell "his side," was improperly introduced into evidence because the arresting officer could not specifically recall giving the appellant the *Miranda* warning. The appellant's argument, however, ignores several important elements found in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda,* the United States Supreme Court held that the *Miranda* warning was required in situations involving custodial interrogation. 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.

The Court refined its position in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in which an arrested murder suspect, advised of his rights, told police where to find the murder weapon after overhearing the police express their concern that children might find the gun and be injured. The Supreme Court held that "interrogation" referred to not only express questioning, but also the "functional equivalent"—any actions or words on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. 446 U.S. at 300–01, 100 S.Ct. at

1689, 64 L.Ed.2d at 308. However, the Court also reaffirmed their position that:

> [t]his is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. As the Court in *Miranda* noted:
>
> "Confessions remain a proper element in law enforcement. *Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.* The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Id., at 478, 16 L Ed 2d 694, 86 S Ct 1602, 10 Ohio Misc. 9, 39 Ohio Ops.2d 237, 10 ALR3d 974.

446 U.S. at 299–300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307 (emphasis added).

■ Nothing in either *Miranda* or *Innis* can be interpreted to invalidate a voluntary statement given without coercion before the defendant was advised of his *Miranda* rights. Although it is clear that the appellant was in custody at the time the tape was obtained, it is equally clear that the tape was made prior to arrest and surrendered voluntarily. The record is uncontradicted that the appellant directed the officers to take the tape from his room. The officers neither questioned the appellant nor solicited the tape, which had been prepared in advance of the arrest. The

---

**12.** We note similar reasoning in *State v. Williams,* 171 W.Va. 556, 301 S.E.2d 187 (1983), where we found that:

> While we are not absolutely convinced of the appellant's competency, neither are we convinced that the trial court's finding of fact on this matter, supported by the testimony of both state psychiatrists, was "clearly wrong." *State v. Meek,* 107 W.Va. 324, 148 S.E. 208 (1929).

*Id.* 171 W.Va. at 560, 301 S.E.2d at 192.

**13.** Even assuming a hearing was required, we note that it would be harmless error. In *State*

*v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974), discussed *infra,* this Court held that where a proven counsel error involved a constitutional right, it would be considered harmless only if proved beyond a reasonable doubt that the error did not contribute to the verdict. *Id.* 157 W.Va. at 666, 203 S.E.2d at 461. Since all the psychiatric reports found the appellant competent to stand trial, we find that any possible error in the failure to hold the competency hearing would be harmless as the result—the appellant being found competent to stand trial—would be the same.

appellant's argument, therefore, lacks the crucial second element of either interrogation or the "functional equivalent."

We also point out that the officers were on the premises pursuant to a valid arrest warrant. The appellant's mother had consented to a search of the house and the appellant consented to the entrance of the police into his room for the purpose of obtaining the tape. In syllabus point 4 of *State v. Thompson*, 176 W.Va. 300, 342 S.E.2d 268 (1986), this Court held that "[a] warrantless electronic recording of a defendant's conversation made before his Sixth Amendment right to counsel has attached, and made with the consent of a participant to the conversation who, unknown to the defendant, is acting in concert with the police, does not violate the prohibition against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution and article III, section 6 of the West Virginia Constitution." The fact that there was no one acting in concert with the police merely strengthens our position that there was no constitutional violation. As the appellant himself voluntarily taped and surrendered the statement, there was no violation of the prohibition against an unreasonable search or seizure.

Closely related to the previous argument is the appellant's contention that the tape was improperly introduced, lacking several necessary elements found in our decision in *State v. Harris*, 169 W.Va. 150, 286 S.E.2d 251 (1982). In *Harris*, we announced the general rule that the following elements were necessary before a tape containing inculpatory statements could be admitted into evidence and played to the jury:

(1) A showing that the recording device was capable of taking testimony;

(2) a showing that the operator of the device was competent;

(3) an establishment of the authenticity and correctness of the recording;

(4) a showing that changes, additions, or deletions have not been made;

(5) a showing of the manner of the preservation of the recording;

(6) an identification of the speakers; and

(7) a showing that the testimony was voluntarily made without any kind of inducement.

*Id.* 169 W.Va. at 154, 286 S.E.2d at 254–55.

We are not persuaded by the appellant's argument. The present case presents a unique set of facts which distinguishes it from our holding in *Harris*. The tape in *Harris* was made by the police and contained a recorded confession by the defendant made during interrogation. By contrast, this tape was made by the appellant before the arrest, for the express purpose of telling "his side" of the story. There is no question that the appellant made the tape himself, although he conceded at trial that the tape was only a "rough draft." The tape was surrendered by the appellant voluntarily.[14] It was not played to the jury nor were they permitted to read the transcript, thus minimizing any actual effect the tape might have had.[15] Finally, we note that the tape does not contain inculpatory statements. While some contradictory evidence was elicited regarding the success of the sex act, the tape supports the appellant's claim that Ms. Elliott went home with him willingly and without force.

Our holding in *Harris* is more appropriately limited to a situation in which the police or their agent control the creation of the tape, thus increasing the danger of fraud, abuse, or coercion by the law enforcement officers. We believe that in a situation such as this, where the appellant voluntarily made and surrendered a tape recording made prior to arrest and interro-

---

14. The judge admitted the tape for the limited purpose of showing that a tape was taken from the appellant, although the jury did hear testimony from the officer that the appellant stated on the tape that he did have sexual intercourse with Ms. Elliott.

15. The court established the chain of custody with the testimony of Officer Coffey, who stated the voice on the tape was the appellant's, that he had personally taken the tape at the appellant's request, marked it with his initials and date, and that the tape had remained in his custody without any alteration since that time.

gation, the danger of abuse is substantially lessened. The police had no control over or influence in the creation of the tape as it was made before the arrest. Once the trial court is satisfied that the tape was properly seized without coercion, preserved by the police and identified, the tape can be admitted into evidence subject to the same rules applicable to other evidence. We note, however, that the scrutiny surrounding the circumstances of how the tape was made and obtained will be heightened if there is evidence of coercion.

## IV.

The appellant's final argument alleges that reversible error was committed when the prosecutor made a statement during closing argument which contained a personal opinion. The prosecutor stated that "[t]his is a five and one half foot tall girl. He's better than six feet tall. Under the circumstances if he told me to shut up or I will kill you, if I was that size, I wouldn't say anything either." Trial Transcript at 303. In support of this proposition, the appellant cites *State v. Critzer*, 167 W.Va. 655, 280 S.E.2d 288 (1981). In *Critzer*, the Court reversed a conviction, ruling that the prosecutor, who compared the defendant to a "vulture" and asserted his belief in the honesty, sincerity, truthfulness, and good motives of his witness, while attacking the honesty of the defendant's witnesses, acted improperly. *Id.* 167 W.Va. at 660–661, 280 S.E.2d at 292.

We agree with the appellant that the prosecutor violated Disciplinary Rule 7–106(C) (1988) of the Code of Professional Responsibility when he asserted his opinion as to the victim's credibility.[16] Unlike the cases cited by the appellant, however, we do not believe the prosecutor's actions in this case rise to the level discussed in *Critzer*. In *State v. Myers*, 159 W.Va. 353, 222 S.E.2d 300 (1976), we "rec-

ognize[d] that wide latitude must be given to all counsel in connection with final argument.... We do not say that every improper remark is a proper basis for a mistrial." *Id.* Nor do we believe this error was of such a magnitude to result in manifest injustice or prejudice to the appellant. *State v. Simon*, 132 W.Va. 322, 52 S.E.2d 725, 734 (1949). We, therefore, hold the error harmless.

For the foregoing reasons, we conclude that the voir dire questions used in this case were adequate for a capital case involving racial issues. We decline to reverse the decision of the Cabell County Circuit Court because of ineffective assistance of counsel, as we are unable to state that a reasonably qualified defense attorney would not have used the same trial strategy in deciding not to request a competency hearing or to raise the insanity defense. We find no *Miranda* issue related to the tape, as the appellant voluntarily surrendered the tape without any interrogation, coercion, or its "functional equivalent" by the police. We also believe the same tape was properly admitted into evidence because this situation differs greatly from that in *Harris* and lacks the potential for abuse which exists when the police control the preparation of the tape. Finally, we believe it was harmless error for the trial judge to permit the prosecutor to express an opinion as to his feelings regarding fear over the appellant's size.

Accordingly, we affirm the action of the Circuit Court of Cabell County.

Affirmed.

---

16. Disciplinary Rule 7–106(c)(4) of the Code of Professional Responsibility provides that a lawyer shall not: "[a]ssert his personal opinion as to the justness of a cause, as to the credibility of a witness, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein."

On January 1, 1989, new Rules of Professional Conduct became effective. Rule 3.4(e) provides, in part, that a lawyer shall not: "in trial, ... assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, [or] the guilt or innocence of an accused...."